Morris A. HICKS, on behalf of himself and all others similarly situated, Plaintiff-Appellee,

v.

The QUAKER OATS COMPANY, Defendant-Appellant.

No. 80–3537.

United States Court of Appeals, Fifth Circuit.*

Unit A

Dec. 7, 1981.

Rehearing and Rehearing En Banc Denied Jan. 18, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452–October 14, 1980.

Glankler, Brown, Gilliland, Chase, Robinson & Raines, Lee J. Chase, III, John I. Houseal, Jr., Memphis, Tenn., Benjamin R. Slater, Jr., New Orleans, La., Theodore A. Woerthwein, Chicago, Ill., The Quaker Oats Co., for defendant-appellant.

Freeland & Gafford, T. H. Freeland, III, Oxford, Miss., for plaintiff-appellee.

Before CHARLES CLARK and RANDALL, Circuit Judges, and SHARP **, District Judge.

RANDALL, Circuit Judge:

This case involves a suit by fourteen former employees of the defendant Quaker Oats Company for benefits under a special retirement program, and presents several difficult questions regarding the law of collateral estoppel. Essentially, the issues revolve around the propriety of the use of

** District Judge of the Northern District of Indiana, sitting by designation.

offensive collateral estoppel with respect to a prior unappealed and alternative ground of decision of a trial court. Because we think that the trial judge abused his discretion by applying offensive collateral estoppel in the circumstances of this case, we reverse and remand for further proceedings.

*Factual Background*

Prior to May 27, 1966, Defendant Quaker Oats Co. had a regular retirement plan for its participating employees, vesting after ten years of continuous service for the company. The retirement plan provided for optional early retirement benefits at a reduced amount beginning at age forty-five, or "full" retirement benefits at age sixty-five. Most, but not all, of the plaintiffs in this action had been continuously employed for ten years by Quaker and thus would have vested rights under the regular plan.

On May 27, 1966, Quaker issued a letter through its Feed Division Vice-President, H. W. Crutchfield, announcing terms for a special new retirement plan. The Crutchfield letter stated that the new program applied to "field sales personnel" who were defined as "field salesmen, field specialists, regional administrators, and regional and district managers." The letter read as follows:

I am most happy to bring you this announcement of a new special retirement feature that I believe will please you.

Our management has felt for sometime that the Quaker Retirement Plan does not realistically recognize the special problems that face field salesmen during the later years of their business careers. The physical and technical demands of present day feed marketing make it increasingly difficult for most to maintain the required fast pace until the age of 65 has been reached.

Therefore, July 1, 1966, we are making effective a new early retirement program for field sales personnel only. It will include field salesmen, field specialists,

regional administrators, and regional and district managers. Important features of the new program, as it applies to eligible Feed Division employees, are outlined below.

They will be placed on an 'inactive status' on the first day of the month following their *60th* birthday.

During the five-year period between age sixty (60) and age 65, they will receive annually in twelve equal monthly installments, one-half of their average *total* compensation for the previous five full calendar years. Total compensation will include bonus and commission, if any, in addition to regular salary.

They must return to active service if recalled, must remain available for special assignments, but may work at other employment if it is not, in the opinion of the Company, in competition with Quaker.

During the five-year period, they will retain their coverage as employees under the Group Life and Medical Care programs.

At the age of 65 years, they will retire under the Quaker Retirement Plan with a total retirement income equal to the amount they would have received had they remained in active employment based on the total income received in the last calendar year before their early retirement.

The new program will not be fully effective for the next two years, or until July 1, 1968. During this period, eligible employees who wish to participate in the new program may elect to do so whenever they wish. Others who have attained age 60 (but less than age 65) may continue in actual employment provided they are needed and are able to perform their normal tasks. On and after July 1, 1968, it is expected that the new program will be applied to all eligible employees.

District or Regional Sales Managers will attempt to answer any question you may have, and I will be pleased to have your comments.

On July 1, 1968, R. E. Hilgenfeld, General Sales Manager of Quaker's Agricultural Products Feed Division, wrote a memorandum stating that the inactive service program became fully effective as of that date:

There has been some question on the status of field sales personnel under this new program due to our policy of going on inactive service with the Company as of the first of the month following their sixtieth birth date. This inactive service program becomes fully effective on July 1, 1968.

At that point any field sales personnel who turned sixty would be required to participate in the inactive status program. On May 27, 1966, plaintiffs' ages ranged from forty-nine to fifty-five years so that all were under sixty years of age on July 1, 1968, when the inactive service program became mandatory.

All of the plaintiffs were in Quaker's employ and still under sixty years of age when, on February 14, 1969, Quaker sold its Agricultural Products Division to Allied Mills, Inc. On the day of the sale, T. B. Bartel, Quaker's Vice President for Employee Relations, issued a statement to the affected employees, including plaintiffs, explaining that their "employment status will be with Allied Mills instead of Quaker Oats Company." Bartel's letter set forth a list of Quaker benefits which would survive the sale to Allied, but did not mention the inactive status program.

All of the plaintiffs were offered employment by Allied, and all accepted. They went to work for Allied and continued in their same positions for various lengths of time. All but two of the plaintiffs eventually elected to take early retirement at age fifty-five or later under Quaker's regular retirement plan. (The record is silent as to the other two.)

In response to several inquiries by former employees about benefits under the inactive status plan, Quaker announced, after some delay, that the plan's benefits did not survive the sale. Each plaintiff, since turning 60, has been available for special assignment by Quaker, and other than in Allied's

service, has not engaged in employment in competition with Quaker. Quaker has not requested the plaintiffs to perform any services for it nor has it acknowledged any obligation to plaintiffs under the inactive status program.

However, during the interim between the Crutchfield letter and the sale to Allied, five field sales employees who attained sixty years of age before the sale were voluntarily paid benefits under the inactive status plan. A sixth field salesman, W. B. Workman, though not yet sixty at the time of the sale, was held entitled in judicial proceedings to benefits payable under that program. Because of the importance of Workman's suit to the case before us, a short description of that litigation is in order.

### The Workman Litigation

On August 3, 1973, W. B. Workman, a former Quaker District Sales Representative, sued Quaker and Allied to recover benefits under Quaker's inactive service program. The case was heard in the Northern District of Mississippi by the same federal district judge who heard the case presently on appeal before this Court. Workman had the unfortunate distinction of being exactly six months away from age sixty at the time of the sale to Allied. He went to work for Allied until September 1, 1971, at which point he turned sixty-two and was required by Allied to take retirement. At that point Workman also took early retirement under Quaker's regular retirement plan. Workman sued Quaker and Allied, claiming that the Crutchfield letter was a contractual promise of future employment under the inactive service plan. The trial court found for Workman against Quaker, but dismissed the suit against Allied. It is the reasoning of the court's opinion, however, which is of special importance to the present case:

> On the undisputed facts shown by this record, the Court holds that Quaker, by the Crutchfield letter, made an irrevocable promise to Workman for service and benefits in the manner set forth in that communication. The essence of the pro-

posal was that if Workman wished to continue in Quaker's employ he would be required to take inactive status at age 60 at a reduced level of compensation, that is, one-half of regular pay, but in consideration for which he would not be required to work except upon special call of Quaker, doing any special assignments, and that he was free to enter other employment which was non-competitive with Quaker. . . .

The trial court held that the proposal was "clear, and unambiguous, and definite." Quaker had argued that the term "eligible" in the Crutchfield letter meant that the inactive status benefits were conditional upon reaching the age of sixty. The court rejected this argument, holding that "eligible" only referred to those employees who fell into certain specified job categories; i. e., "field sales personnel" as defined in the Crutchfield memo:

> In the opinion of this Court, the words used in describing the covered employees can reasonably mean only those persons who are expressly mentioned by job category. We reject any interpretation that the word "eligible" means only a covered Feed Division employee when he becomes 60 years of age, as Quaker would contend. Moreover, it is noteworthy that Crutchfield's offer contained no provision for revocation or modification, nor was it conditioned upon Quaker's continuing in the agricultural feed business at Tupelo, nor was any other qualification attached to the offer which would relieve Quaker of its undertaking. Quaker was free to have inserted such protective, or limiting, clauses had it so desired, but it utterly failed to do so. On the contrary, Quaker's language plainly indicates that the inactive service program was mandatory on all covered employees, regardless of their age, if they were still in active service on and after July 1, 1968.

The court continued:

> Quaker's offer being of a clear, definite, and explicit nature, and upon acceptance by Workman, it became and did become a binding contract. It is plainly

evident that Workman accepted the proposal at once. Indeed, he had no other choice if he wished to continue working for Quaker; this he did, and performed to the complete satisfaction of Quaker.

The court also offered a second ground of decision for the *Workman* case, based upon the doctrine of detrimental reliance:

> Moreover, the parties affirmatively acted upon the proposal by taking specific steps, looking to Workman's early retirement, or assuming inactive status at age 60. Workman not only trained McGill, his successor, but he paid McGill a portion of his salary, at Quaker's instructions. Thus, benefits to Quaker, as the promisor, in the securing of a successor trained by Workman, as well as the financial detriment suffered by Workman, as promisee, manifestly appear from this record. Good and valuable considerations in both aspects, to be legally sufficient, are found to be present.

The court concluded by noting that because Quaker had entered into a valid, binding, bilateral agreement, it could not be excused from performance when it sold its business to Allied. Disavowal of the Crutchfield letter amounted to a breach, excused Workman from further performance, and entitled him to damages. The court also held that even though Workman had accepted regular retirement benefits in the interim, this did not prevent him from receiving benefits under the Crutchfield proposal. Nor did Workman have a duty to mitigate damages, since he was no longer a Quaker employee and Quaker had not asked him to perform any services for it.

Quaker did not appeal the decision in *Workman v. The Quaker Oats Company.*

*The Hicks Litigation*

On December 23, 1975, Morris A. Hicks instituted a civil class action against Quaker alleging a modification and subsequent breach of his employment contract on the basis of the Crutchfield letter. In his pleadings, Hicks based his action on what he believed to be the primary theory of the *Workman* decision; namely, that the Crutchfield letter had modified his at-will employment contract into a bilateral agreement for a definite term of employment whose termination would be a breach. Hicks later filed an amended complaint alleging that he and members of the plaintiff class had acted in detrimental reliance on the Crutchfield letter. This was essentially the second ground of decision in the *Workman* opinion. Quaker answered Hicks' complaint and moved for summary judgment. The district court denied the motion, and Hicks then moved for summary judgment. At that point the district court denied Hicks' motion, then reversed its earlier decision and granted Quaker's motion for summary judgment.

The district court held that the Crutchfield memo could not have modified plaintiffs' at-will employment contracts into contracts for a definite term because the plaintiffs had offered no additional consideration beyond the rendition of personal services. It relied on Mississippi cases which stated that a contract for "permanent employment" is at-will unless consideration over and beyond the rendition of personal services is given.[1] The court distinguished its *Workman* opinion by noting that in that case, Workman had taken affirmative steps by training and paying his successor in reliance on Quaker's promises. This, the court thought, constituted sufficient consideration. The court explained:

> In view of the foregoing, Workman's circumstances clearly came within the exception to the general rule under which a contract of employment for an indefinite period may be modified so as to become employment for a specified time by the giving of sufficient consideration from the employee in addition to his merely continuing to work for his employer.... By contrast, however, none of the plaintiffs class is shown to have done anything more than to have continued to work for

---

1. *Sartin v. City of Columbus Utilities Comm'n.,* 421 F.Supp. 393 (N.D.Miss.1976), *aff'd,* 573 F.2d 84 (5th Cir. 1978), citing *Rape v. Mobile &* *O. R.R. Co.,* 136 Miss. 38, 100 So. 585 (1924); *Masonite Corp. v. Handshoe,* 208 Miss. 166, 44 So.2d 41 (1950).

Quaker until the sale to Allied; they voiced no concern with Quaker's failure to mention the inactive status program in its memorandum describing benefits available to covered employees upon the consummation of the sale.... Therefore, despite plaintiffs' argument to the contrary, it is manifestly clear that this suit is not controlled by our prior ruling in Workman.

Hicks then filed a "Motion for Reconsideration" which the district court treated as a Rule 60(b) motion. Hicks claimed that Quaker had not shown an absence of material dispute as to the issue of reliance. The court agreed. It held that although the bilateral contract theory of *Workman* was foreclosed to plaintiffs, the detrimental reliance theory that plaintiffs had also plead still presented issues of triable fact. The court, however, explained that it had other reasons for granting a motion to reconsider:

A second consideration which impels us to grant a Rule 60(b) motion is that counsel for the plaintiff class, from the inception of this case, relied principally upon what they perceived to be the primary basis for this court's decision in an earlier suit against Quaker which concerned the same "inactive service" program, an action styled *Workman v. Quaker Oats Co.,* ... In the course of its rendition of the *Workman* decision, the court ... stated that the Crutchfield letter, quite definite in all respects, became an irrevocable promise which at once ripened into a bilateral contract when Workman continued to work for Quaker. This statement of law is, without question, overly broad in that it omits the necessity for a consideration to support Quaker's promise. In accordance with generally settled principles of law relating to employment contracts, performance of personal service alone under a contract for an indeterminate period of time, and thus terminable at will, does not constitute independent consideration to convert an employment agreement into one for a fixed period of time. [citations omitted] We can appreciate that certain language in *Workman* probably misled counsel for plaintiff into

relying solely upon their first asserted ground of recovery, namely, that the Crutchfield letter constituted an irrevocable binding contract upon acceptance by an affected employee who provided no consideration, apart from rendering regular service for which he was hired and paid. We thus believe that the failure of plaintiffs to show consideration in the form of detrimental reliance by plaintiffs or benefit to Quaker, if such should be the case, is an excusable omission.

The court then decertified the class, since proceedings at trial would now turn on proof of individual instances of reliance. Fourteen persons subsequently filed complaints in intervention.

A pre-trial order was entered on August 30, 1979. On October 17, 1979, five days before trial was scheduled to begin, plaintiffs filed a motion to amend their complaints and the pre-trial order to allege that Quaker was collaterally estopped from relitigating issues in the action which had been decided adversely to it in the *Workman* litigation. Specifically, plaintiffs sought to use as collateral estoppel the finding in *Workman* that the Crutchfield letter was a modification of an at-will employment contract which created a binding bilateral agreement. The district court granted the motion to amend over Quaker's objection.

At trial, plaintiffs presented substantial evidence of reliance upon the Crutchfield letter and the Hilgenfeld memorandum. The trial judge found that all the plaintiffs except one (Willis E. Wroe) were in Quaker's employ at the time of the release of the Crutchfield letter. Four regional managers, Ray M. Ammon, George P. Moseley, Bennie Beckerdite, and Richard Psolla, testified that they and their field sales force were uneasy that Quaker would not remain in the feed business after the company's sale in 1967 of 50 country elevators and a feed mill in Sioux City, Iowa, and in 1968 of its Canadian feed business. Quaker made these dispositions after the Crutchfield plan was promulgated. These regional managers and the district managers under them,

in an effort to meet inquiries from the sales personnel, were consistently instructed by Crutchfield and Hilgenfeld to use the inactive status program as signifying Quaker's intent to stay in the feed business in the United States and to use the plan to retain Quaker's good sales personnel and to hire others from competitors. For example, plaintiff Wroe was hired January 1, 1967, as a field salesman by Hilgenfeld and Beckerdite who induced him to leave employment by a competitor on the strength of Quaker's fringe benefits, particularly the inactive status plan.

The record showed that Quaker's management was cognizant of the great value of a productive sales force and the sizeable expense of $20,000 to $25,000 entailed in training a salesman, and the company stressed the inactive status program as a unique feature which its competition could not match. In fact, no Quaker competitor was known to offer to its employees a similar plan for inactive service. As a consequence, there was little, if any, turnover in field sales personnel after this assurance was given.

The trial judge found that until the sale to Allied, Quaker's management continued to emphasize the distinctive advantages of the program as a part of the fringe benefits in working for Quaker. After the release of the Crutchfield and Hilgenfeld communications, all of the plaintiffs except Sylvester Grogg received offers, or at least overtures, of possible employment at greater salaries from other firms, including certain Quaker competitors. Each plaintiff considered himself free to leave Quaker at any time and accept employment elsewhere. A number of plaintiffs discussed their respective job opportunities with either Crutchfield or Hilgenfeld, or both; they were urged by these supervisors to consider the fringe benefits before leaving Quaker's employ. Plaintiffs invariably decided to stay with Quaker and not pursue other prospective employment, principally because of Quaker's unmatched program of fringe benefits which featured inactive service beginning at age sixty.

Sometime in 1968, Quaker's top officers instructed Crutchfield to find a buyer for its Agricultural Products Division and kept the information secret. None of the plaintiffs knew of an impending sale until Allied's purchase was announced by Quaker executives at 2 p. m. on February 14, 1969, in a meeting at Chicago, Illinois, attended by regional and district managers. As instructed, the managers telephoned their field salesmen to inform them of the sale and that they would be offered jobs by Allied. Quaker's President, Robert D. Stuart, Jr., advised the Division employees that "[s]ince no two companies have identical benefits plans there will necessarily be some changes in the makeup of your total benefit structure. In the near future you will be hearing from Allied Mills. They have assured us of their desire and intention to retain and fairly compensate all Agricultural Products employees, and we are certain that when you hear from them you will find this to be the case." Although Allied had a retirement plan which required its employees to retire at age 62, it had no inactive status program. Allied, too, disavowed responsibility for the Crutchfield proposal.

All of the above evidence of reliance was developed after a four day bench trial and appears in the trial court's findings of fact. However, in its memorandum opinion, the trial court did not reach the issues of reliance and promissory estoppel. Instead the court ruled for plaintiffs on the basis of collateral estoppel. The opinion stated, in pertinent part:

We have concluded that the *Workman* decision applies to preclude Quaker from relitigating the issues raised in this case, and that there are no considerations of unfairness which prevent the offensive use of collateral estoppel by plaintiffs. This disposition makes it unnecessary to discuss the alternative contentions of the parties and mandates a recovery for plaintiffs.

The court stated that *Workman* had decided the precise issue before the court in the present case, namely, the enforceability

of the Crutchfield letter as a binding bilateral contract. This was, the court held, the first ground of decision in *Workman*:

Quaker argues that *Workman* is legally distinguishable from the present action because the present plaintiffs have not shown that they furnished an independent consideration, apart from remaining in Quaker's employment, to make the offer binding. No plaintiffs were called on to train or pay a successor, as Workman did, or took detrimental action of the character that Workman took in reliance upon the Crutchfield offer. Quaker also contends that plaintiffs' refusal of, or refusal to consider, other employment opportunities does not amount to detrimental reliance, a point which we need not decide. The court agrees that these factual distinctions exist and acknowledges that this court, in making the bench ruling in *Workman*, perhaps stated the law too broadly by holding that the Crutchfield letter ripened into a bilateral contract as soon as Workman received it and continued to work for Quaker. Such a statement, taken alone, omits the necessity for an independent consideration to support Quaker's promise of future employment.... Nevertheless, the present issue is not whether *Workman* can be distinguished through a different application of the law, but whether *Workman*, even if erroneous, is now binding upon Quaker because of collateral estoppel.

The court then held that although *Workman* had been decided upon two independent and alternative grounds, this did not prevent the use of collateral estoppel since "where a prior judgment is based upon two essential, though alternative grounds, as here, each is a good estoppel." Finally the court considered and rejected the arguments by Quaker that the use of offensive collateral estoppel would be unfair on the facts of this case. Although it acknowledged that Quaker's "most appealing argument" was that the issue precluded in this case was based on grounds "broader than necessary" to support the result in *Workman*, it noted that an inquiry into the correctness of prior decisions would defeat the very purposes which the doctrine of collateral estoppel was designed to serve. Hence it could discern no legally cognizable reason for not applying offensive collateral estoppel on the facts of the case.

After applying collateral estoppel to prevent Quaker from denying the existence of a valid bilateral agreement, the court used its *Workman* decision as collateral estoppel to dispose of Quaker's other major arguments, namely, that (1) even if there was a valid contract, acceptance of benefits under the regular Quaker retirement program precluded twelve of the fourteen *Hicks* plaintiffs from participating in the inactive status program and (2) that none of the *Hicks* plaintiffs had properly mitigated damages.

A judgment for the plaintiffs was entered. In denying defendant's Motion for Reconsideration of the application of offensive collateral estoppel, the district court wrote:

Defendant emphasizes certain views expressed by the court in its interlocutory rulings in the present case as to the rationale of its decision in *Workman v. The Quaker Oats Company* which are claimed to be at variance with its final opinion upon which judgment has been entered in this cause. Conceding that inconsistencies may exist, we know of no rule of law that prohibits the court from modifying or correcting its own views during the progress of litigation and prior to final judgment. Despite Quaker's vigorous arguments, we fail to see any legally cognizable considerations of unfairness in invoking collateral estoppel against it. The important, ultimate question is whether this court, in its final judgment, has correctly interpreted the true foundation of its holding in *Workman*. We believe that we have.

On appeal, Quaker contests the use of offensive collateral estoppel based upon the *Workman* decision to establish the existence of a valid bilateral contract for a fixed term of employment, and the subsidiary holdings in *Workman* that (1) the regular retirement

program and the inactive status program were not mutually exclusive retirement plans, and (2) the unique features of the inactive service plan relieved Workman (and hence the *Hicks* plaintiffs) of any duty to mitigate damages.

█ We begin by noting that the federal law of collateral estoppel applies in this diversity action. Were we concerned with the collateral estoppel effects of a prior state court determination, we would use the state's law of collateral estoppel, but where the prior determination was also a federal diversity action, federal common law principles will apply. *Stovall v. Price Waterhouse Co.*, 652 F.2d 537 (5th Cir. 1981); *Southern Pacific Transportation Co. v. Smith Material Corp.*, 616 F.2d 111 (5th Cir. 1980); *Willis v. Fournier*, 418 F.Supp. 265 (M.D.Ga.), *aff'd without opinion*, 537 F.2d 1142 (5th Cir. 1976); *see Johnson v. United States*, 576 F.2d 606 (5th Cir. 1978); *Aerojet-General Corp. v. Askew*, 511 F.2d 710 (5th Cir.), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975). This point is important, because unlike federal common law, Mississippi state law does not permit the offensive use of collateral estoppel. *Compare Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), *with Ditta v. City of Clinton*, 391 So.2d 627 (Miss.1980), *as modified on denial of rehearing, id.* (Miss.1981).

█ Federal common law permits the use of collateral estoppel upon the showing of three necessary criteria:

(1) that the issue at stake be identical to the one involved in prior litigation;

(2) that the issue has been actually litigated in the prior litigation; and

(3) that the determination of the issue in the prior litigation has been a critical and necessary part of the judgment in that earlier action.

**2.** The "separable facts" doctrine was especially helpful to the Internal Revenue Service in relitigating tax questions decided adversely to it in previous litigation, since collateral estoppel against the IRS was equivalent to perpetual special tax treatment for a given litigant. *See Sunnen, supra*, at 599, 68 S.Ct. at 720. Thus the "separable facts" doctrine has been used most often in tax-related litigation. *See, e. g.,*

*Stovall, supra*, at 540; *Johnson, supra*, at 615. Quaker does not contest that the issue of the enforceability of the Crutchfield letter was litigated in *Workman*. Rather, Quaker argues that collateral estoppel should not apply because (1) the issue decided was one of law and (2) the holding was an alternative ground of decision.

*Collateral Estoppel as to Issues of Law*

█ Quaker contends that estoppel should not apply because the erroneous holding of contractual liability is a pure question of law, and collateral estoppel does not apply to unmixed questions of law. For this proposition Quaker cites *United States v. Moser*, 266 U.S. 236, 45 S.Ct. 66, 69 L.Ed. 262 (1924). In addition, although Quaker did not cite the case, it might equally well have relied on *Commissioner v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), which developed the doctrine of "separable facts." This doctrine stated that in order for an issue of law to be binding as collateral estoppel "the controlling facts and applicable legal rules must remain unchanged." *Id.* at 600, 68 S.Ct. at 720. This had been interpreted to mean that where the legal effect of an instrument was determined in one litigation, the legal effect of another instrument with identical language was not determined by collateral estoppel, as long as the two instruments were "formally separable," that is, were separate documents. *Id.* at 599–602, 68 S.Ct. at 720–721.[2] The problem with Quaker's argument is that even if we assume that the estoppel relied on by plaintiffs is a pure, unmixed question of law, collateral estoppel would apply. The reason for this is that both *Moser* and *Sunnen* must be understood in the light of *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

*Jackson v. King*, 223 F.2d 714 (5th Cir. 1955). However, the doctrine has never been popular with commentators, as its emphasis on a rigid formalism for its own sake is unsound without some other compelling reason for denying issue preclusion. *See generally* 1B Moore's Federal Practice ¶¶ 0.442[4], 0.448 at 3415, 4237–4239 (2d Ed. 1976).

*Montana* involved the constitutionality of a gross receipts tax on public, but not private, construction projects. In a prior litigation brought by a contractor, but financed and controlled by the United States (to whom the tax would have been passed on), the Montana Supreme Court held that there was no constitutional problem with the tax. The United States did not appeal this determination to the Supreme Court. A later second suit seeking a refund for certain tax payments stemming from public contracts different from those involved in the first suit resulted in a dismissal of the complaint on the grounds of collateral estoppel. Finally, the United States brought a third action in federal court challenging the constitutionality of the tax with respect to still other public contracts. The Supreme Court held that the United States' control in the first suit put it in the same position as if it had instituted both actions in its own name. More important for our purposes, it held that collateral estoppel was applicable on the issue of the constitutionality of the tax even though the public contracts involved in the federal suit contained slightly different provisions than those in the first suit. Finding these differences not "essential to the judgment" or "of controlling significance," 440 U.S. at 158, 99 S.Ct. at 976, the Court said that collateral estoppel precluded the federal action. In response to an argument based on the "separable facts" doctrine of *Sunnen*, the Court characterized *Sunnen* as standing only for

the proposition that estoppel would not apply where there was a change in controlling legal principles between the two decisions and held that "unless there have been major changes in the law, *Sunnen* is inapplicable." 440 U.S. at 161, 99 S.Ct. at 977. In light of this language it is likely that the "separable facts" doctrine of *Sunnen* is a dead letter, since *Montana* involved separate documents with slightly differing language.[3]

The Supreme Court also considered the applicability of *Moser*, and concluded that *Moser* is limited to situations involving " 'unmixed questions of law' in successive actions involving substantially unrelated claims." 440 U.S. at 162, 99 S.Ct. at 978. Quoting *Moser*, it held that "a subsequent action *upon a different demand*" does not create estoppel, while "a *fact, question,* or *right* distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law." *Id.,* quoting *Moser, supra,* 266 U.S. at 242, 45 S.Ct. at 67 (emphasis supplied in *Montana* ). We think that the same contractual rights and questions surrounding the Crutchfield letter are involved in both the present case and in *Workman.* Hence we do not believe Quaker can escape estoppel based upon the doctrine of *Moser* as it has been explained in *Montana v. United States.*[4]

---

**3.** Other courts have read the decision in *Montana v. United States* in much the same way. *American Medical International, Inc., et al. v. Secretary of Health, Education and Welfare,* No. 79 1460 (Slip Opinion D.C. Cir. August 14, 1981); *Starker v. United States,* 602 F.2d 1341 (9th Cir. 1979). *But see Western Oil & Gas v. United States Environmental Protection Agency,* 633 F.2d 803 (9th Cir. 1980) (*Sunnen* principles continue to provide valuable guidance, especially in context of federal agency relitigation of legal issues with substantial public policy implications).

**4.** The position of the Second Restatement is in accord. The Reporter's note to comment c of Section 68 explains that

[t]he Comment also makes the point that issue preclusion may apply even though the events involved in the two proceedings took

place at different times (or the question was one of the status or condition at different time periods) if the facts are sufficiently similar or identical for purposes of the applicable rule of law. *The preclusion is proper if the question is one of the legal effect of a document identical in all relevant respects to another document whose effect was adjudicated in a prior action.... [T]he Comment makes the point that preclusion applies to issues of law and law application as well as to issues of fact.*

(emphasis supplied). Restatement (Second) of Judgments Reporter's Note § 68, comment c at 18–19 (Tent. Draft No. 4, April 15th, 1977).

Section 68.1(b) states that issue preclusion does not apply where "[t]he issue is one of law and (i) the two actions involve claims that are substantially unrelated, or (ii) a new determination is warranted in order to take account of an

*Collateral Estoppel Effect of Unappealed Alternate Grounds of Decision*

Quaker's next argument is that the first ground of decision in *Workman* should not be given collateral estoppel effect because it is only an alternative ground. Hicks replies that the rule has always been that "if a court decides a case on two grounds, each is a good estoppel." *Irving National Bank v. Law*, 10 F.2d 721 (2d Cir. 1926). *See also* Restatement of Judgments § 68, comment n (1942).

■ As we discuss *infra*, it has only been recently that this "alternative ground" rule has been called into question by courts and commentators. However, it has always been the rule that although an issue was fully litigated and a finding made on the issue in prior litigation, the prior judgment will not act as collateral estoppel as to the issue if the issue was not necessary to the rendering of the prior judgment, and hence was incidental, collateral, or immaterial to that judgment.[5]

The rationale for this rule was two-fold: first, an immaterial issue may not have been afforded the same careful deliberation and analysis as an issue necessary to the judgment. Second, and more important, a decision on an immaterial issue provides the losing party with no incentive to contest an erroneous decision by appeal. If the issue is immaterial, the appeal is probably frivolous, and likely to be so considered by any court reviewing it. Moreover, the losing party is unlikely to appeal a judgment which can have no effect on the outcome of his case.

These same considerations apply equally well in the context of an alternative ground of decision which is not appealed by the losing party. Since one alternative ground will support the judgment, the losing litigant has little incentive to appeal another ground, even if erroneous. Second, because there is no incentive to appeal, the losing litigant will be less likely to consider collateral consequences of the erroneous ground, and this may disadvantage him unfairly later, unless he is particularly prescient.

To this it may be objected that if the losing litigant wishes to insure that there are no collateral consequences, he should appeal the judgment, even if he would lose on the basis of another alternative ground. This is because the general rule is that if a judgment is appealed, collateral estoppel only works as to those issues specifically passed upon by the appellate court.[6]

intervening charge in the applicable legal context or otherwise to avoid inequitable administration of the laws. . . . "

Comment b explains that

[w]hen the claims in two separate actions between the same parties are the same or are closely related—for example, when they involve asserted obligations arising out of the same subject matter—it is not ordinarily necessary to characterize an issue as one of fact or of law for purposes of issue preclusion. If the issue has been actually litigated and determined and the determination was essential to the judgment, preclusion will apply. . . . In such a case, it is unfair to the winning party and an unnecessary burden on the courts to allow repeated litigation of the same issue in what is essentially the same controversy, even if the issue is regarded as one of "law". Thus if a corporation issues a series of notes for the repayment of a loan, and the holder of the notes brings an action on one of them, and the corporation's defense that issuance of the notes was ultra vires is rejected by the court, the judgment is conclusive on that issue in a subsequent action on another of the notes.

5. *E. g., Norton v. Larney*, 266 U.S. 511, 45 S.Ct. 145, 69 L.Ed. 413 (1925); *Fibreboard Paper Products Corp. v. East Bay Union of Machinists, Local 1304*, 344 F.2d 300 (9th Cir.), *cert. denied*, 382 U.S. 826, 86 S.Ct. 61, 15 L.Ed.2d 71 (1965); *Paine & Williams Co. v. Baldwin Rubber Co.*, 113 F.2d 840 (6th Cir. 1940); Restatement (Second) of Judgments § 68 comment h (Tent. Draft No. 4, April 15, 1977); Restatement of Judgments § 68 comment o (1942); 1B Moore's Federal Practice ¶ 0.443 at 3919 n.4 (2d ed. 1976) and cases cited therein. The rule is merely another way of stating the familiar requirement that the issue precluded must be necessary to the prior judgment. *Stovall v. Price Waterhouse Co.*, 652 F.2d 537, 540 (5th Cir. 1981); *Johnson v. United States*, 576 F.2d 606 (5th Cir. 1978).

6. *Plastic Container Corp. v. Continental Plastics*, 607 F.2d 885 (10th Cir. 1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *Stebbins v. Keystone Insurance Co.*, 481 F.2d 501 (D.C.Cir.1973); *Martin v. Henley*, 452 F.2d 295, 300 (9th Cir. 1971); *International Refugee Organization v. Republic S.S. Corp.*, 189 F.2d 858 (4th Cir. 1951); *Allegheny County*

However, this argument is problematic for two reasons. First, if the judgment is appealed, and is sustainable on one admittedly good ground, the appellate court, if it does pass upon the allegedly erroneous ground, is less likely to give rigorous consideration to it. *See Developments in the Law—Res Judicata*, 65 Harv.L.Rev. 813, 845 (1952). But more important, forcing a losing litigant to take an appeal he knows he will lose on the basis of one alternative ground is a waste of the resources of both litigants and courts, and is contrary to the principles of judicial economy which motivated the doctrine of collateral estoppel in the first place.

Because of these considerations, the American Law Institute, in its Tentative Draft No. 4 of the Restatement of Judgments Second, has abandoned the "alternative ground" rule when a decision is not appealed by the losing party. Restatement (Second) of Judgments § 68, comment i (Tent. Draft No. 4, April 15, 1977). Although the new Restatement position is as of now supported by only a few cases in the federal courts,[7] we think that the reasoning

*v. Maryland Cas. Co.*, 146 F.2d 633 (3d Cir. 1944), *cert. denied*, 325 U.S. 855, 65 S.Ct. 1184, 89 L.Ed. 1975 (1945). See Restatement (Second) of Judgments § 68 comment o (Tentative Draft No. 4, April 15, 1977); Restatement of Judgments § 68 comment n, § 69 comment b (1942); 1B Moore's Federal Practice ¶ 0.416[2] at 2232 n.10 (2d ed. 1976) and cases cited therein; *id.* at ¶ 0.443[5] at 3920-22; Scott, *Collateral Estoppel by Judgment*, 56 Harv.L.Rev. 1, 15 (1942). The only federal case squarely opposed to this rule is *Russell v. Russell*, 134 F. 840 (3d Cir. 1905), *appeal dismissed*, 200 U.S. 613, 26 S.Ct. 755, 50 L.Ed. 620 (1906). *But cf. Markoff v. New York Life Insurance Co.*, 369 F.Supp. 308 (D.Nev.1973), *aff'd* 530 F.2d 841 (9th Cir. 1976) (Nevada diversity case applying California law).

7. The major case relied on by the Restatement is *Halpern v. Schwartz*, 426 F.2d 102 (2d Cir. 1970). *Halpern* involved a litigant, Evelyn Halpern, who had been declared bankrupt on the basis of a district court's holding that her assignment of a bond to her son constituted an act of bankruptcy. The district court based its decision on three separate and alternative statutory grounds. One of these required a finding that she had assigned the bond with intent to hinder, defraud, or delay creditors; the other two grounds did not require a showing of intent. Because an appeal of the issue of intent would have been fruitless given the two alternate grounds, Halpern appealed on the ground that there was insufficient evidence of an assignment of the property in question. (This argument, if accepted, would have disposed of all three grounds.) The appellate court affirmed without opinion. Shortly thereafter, the trustee in bankruptcy opposed Halpern's discharge, using the alternative finding of intent to defraud as collateral estoppel. On the basis of this finding, the district court granted summary judgment to the trustee and denied the discharge. On appeal, the Second Circuit held that the alternative ground could not be used as collateral estoppel. In so doing it distinguished virtually all of the cases which had been previously thought to support the alternative grounds rule, an exercise which we will not repeat here. 426 F.2d at 106-107. *See also* Annotation 29 A.L.R.Fed. 764 (1976), which argued that prior federal courts "either stated and followed the rule without question, or there were factors present which diluted the authority of their statements as definitive precedent for that [the alternative grounds] rule." *Id.* at 767.

*Halpern* is not direct support for the Restatement position, since there was an appeal of the prior litigation. The appeal, however, was without opinion, so it was impossible to say upon which grounds the lower court's decision was affirmed. It thus put the decision in an equivalent posture to an unappealed decision of a court of first instance. *Cf. Russell v. Place*, 94 U.S. (4 Otto) 606, 24 L.Ed. 214 (1877); *Stebbins v. Keystone Insurance Co.*, 481 F.2d 501 (D.C.Cir.1973); *Horner v. Ferron*, 362 F.2d 224, 230 (9th Cir.), *cert. denied*, 385 U.S. 958, 87 S.Ct. 397, 17 L.Ed.2d 305 (1966); *Security Ins. Co. v. Johnson*, 276 F.2d 182 (10th Cir. 1960); *Scrofani v. Rare Bird Farm, Inc.*, 208 F.2d 461 (5th Cir. 1953) (prior decision not conclusive as estoppel when it is unclear upon which ground judgment was based.)

We are aware that *Halpern* has been limited to bankruptcy situations by two succeeding decisions of the Second Circuit: *Winters v. Lavine*, 574 F.2d 46, 66–68 (2d Cir. 1978), and *Williams v. Ward*, 556 F.2d 1143, 1154 (2d Cir.), *cert. dismissed*, 434 U.S. 944, 98 S.Ct. 469, 54 L.Ed.2d 323 (1977). However, both of these cases distinguished *Halpern* by showing that the concerns expressed by that opinion were not present. First, in both *Winters* and *Williams* the "prior" and "later" suits were pursued simultaneously so that the plaintiff could "fully anticipate the potential res judicata effects of the earlier judgment in deciding not to appeal." *Winters, supra*, at 68, quoting *Williams, supra*, at 1154. Second, in neither *Winters* nor *Williams* was there a sufficient concern that the alternate ground relied on was not given "the careful deliberation and analysis normally applied to essential issues." *Win-*

behind it is especially appropriate to the facts of this case, where not only do we have an unappealed and allegedly erroneous alternative ground of decision used for collateral estoppel purposes, but plaintiffs seek to use collateral estoppel offensively.

This last point is of some importance. When collateral estoppel is used offensively the problems with the "alternative ground" rule are heightened and the arguments against the rule become even more persuasive. In such a case, the losing party must guard against not only a subsequent use of the alternative ground by the plaintiff he has just faced, but he must take into account any possible future plaintiffs who might use the ground against him some day. A losing party would thus be well advised to appeal any judgment based on alternative grounds as a matter of course—for even if he were sure that the particular plaintiff he has just faced will never trouble him again, he could not be sure that some other plaintiff would not emerge later to use the results of the litigation against him. Applying the rule in the context of offensive collateral estoppel thus makes a virtual certainty that judicial resources will be needlessly wasted in cases like *Workman.* Such a result does a great disservice to the purposes behind the doctrine of issue preclusion.[8]

We have stated just now that the arguments against the "alternative ground" rule are made more persuasive when estoppel is used offensively. We think as well that the traditional arguments concerning the unfairness of offensive collateral estoppel are bolstered when the estoppel used is an alternative ground.

■ As a preliminary matter, we note that considerations of fairness are of great importance in determining when use of offensive collateral estoppel should be permitted. Indeed, the Supreme Court has expressly stated that "where the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Parklane, supra,* at 331, 99 S.Ct. at 651. Even before the decision in *Parklane,* this Circuit had stressed the importance of fairness in the particular circumstances of a given case when a litigant sought to invoke offensive collateral estoppel against a nonparty to a prior litigation. *Johnson v. United States,* 576 F.2d 606, 614–615 (5th Cir. 1978); *Rachal v. Hill,* 435 F.2d 59, 61–63 (5th Cir. 1970), *cert. denied,* 403 U.S. 904, 91 S.Ct. 2203, 29 L.Ed.2d 680 (1971). Next we note that although the offensive use of collateral estoppel is now accepted by many commentators,[9] support is by no means uni-

---

*ters, id.; Williams, id.;* both quoting *Halpern, supra,* at 105.

Moreover, *Halpern* is not the only case which has questioned the alternative grounds rule. *Stebbins v. Keystone Insurance Co.,* 481 F.2d 501 (D.C.Cir.1973) cited *Halpern* and refused to give collateral estoppel effect to one ground of decision on the merits when the other ground was a failure to exhaust administrative remedies. ·It found it unnecessary to decide if *Halpern* was applicable "as a general rule to a wide range of matters." *Id.* at 508. However, *Stebbins* cited with approval the new Restatement rule in § 68 comment i, as did *American Telephone and Telegraph Co. v. Federal Communications Commission,* 602 F.2d 401, 409–410 at n.48 (D.C.Cir.1979). *Cf. Tanker Hygrade No. 18, Inc. v. United States,* 526 F.2d 805 (Ct.Cl.1975), *cert. denied,* 426 U.S. 920, 96 S.Ct. 2624, 49 L.Ed.2d 373 (1976) (Finding it unnecessary to decide if *Halpern* approach is sound but denying collateral estoppel effect to one of several findings of fact received for cumulative effect in prior decision to grant injunctive relief.).

**8.** The fact that offensive collateral estoppel may lead to an increase in litigation because litigants must protect themselves from future attack by unknown plaintiffs is a common objection to the use of offensive estoppel. *See, e. g.,* Polasky, *Collateral Estoppel—Effects of Prior Litigation,* 39 Iowa L.Rev. 217, 220 (1954); Moore and Currier, *Mutuality and Conclusiveness of Judgments,* 35 Tul.L.Rev. 301, 309 (1961); Greenbaum, *In Defense of the Doctrine of Mutuality of Estoppel,* 45 Ind.L.J. 1, 10–12 (1969).

**9.** *See, e. g.,* Callen and Kadue, *To Bury Mutuality, Not to Praise it: An Analysis of Collateral Estoppel After Parklane Hosiery Co. v. Shore,* 31 Hastings L. Rev. 755 (1980); Polasky, *supra,* n. 8, at 217; Semmel, *Collateral Estoppel, Mutuality, and Joinder of Parkes,* 68 Colum.L.Rev. 1457 (1968); *Note: A Probabilistic Analysis of the Doctrine of Mutuality of Collateral Estoppel,* 76 Mich.L.Rev. 612 (1978); Restatement (Second) of Judgments §§ 88, 68.1 (Tent. Draft No. 2, 1975); *Compare,* Currie, *Mutuality of*

versal,[10] and it is important to remember that many of the arguments offered against offensive use of collateral estoppel in general still have validity in questioning the fairness of applying the doctrine in the context of particular fact situations. *See Parklane, supra*, at 330–331 (listing four standard objections to doctrine and then stating that use of offensive estoppel should be denied where for these reasons or for others application would be unfair). *See also* Restatement (Second) of Judgments § 88 (Tent. Draft No. 2, April 15, 1975) offensive estoppel).

In the light of these preliminary considerations, we think that several of the standard arguments against the use of offensive collateral estoppel take on a new urgency in the context of this case, where plaintiffs are relying on an alternative ground of decision of a court of first instance. A common objection to using offensive estoppel is that in the first action the defendant may have little incentive to defend the suit vigorously if it is for a small amount, and so it is unfair to subject him to a much larger liability later on the basis of the earlier litigation.[11] Precisely this situation obtains here. The *Workman* litigation subjected Quaker to a liability of approximately $35,-000 whlie the present plaintiffs relying on that judgment stand to collect over $400,-000. Moreover, other possible plaintiffs who were employees of Quaker at the time of the Hilgenfeld Memorandum may be able to subject Quaker to considerably more liability in the future if this estoppel is used subsequently.[12]

This argument gains even greater force when it is recognized that Quaker had even less incentive to appeal the result in *Workman* because it was based on alternative grounds of decision. Appeal is not an inexpensive proposition, and Quaker could hardly be faulted for declining to appeal a comparatively minor award against it when the judgment could easily be sustained upon a finding of detrimental reliance by Workman. The fact that alternative grounds of decision exist thus makes the lack of incentive for vigorous defense even stronger and the application of offensive collateral estoppel even more unfair.

A second argument against offensive estoppel is that it discourages prospective plaintiffs from intervening in litigation and thus disserves the purposes behind the doctrine of issue preclusion. As the Supreme Court explained the objection in *Parklane* :

[O]ffensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely "switching adversaries." [citation omitted] Thus defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. [citation omitted] Thus offensive use of

*Collateral Estoppel: Limits of the Bernhard Doctrine*, 9 Stan.L.Rev. 281 (1956) (generally supportive of offensive estoppel but offering several criticisms) *with* Currie, *Civil Procedure: The Tempest Brews*, 53 Calif.L.Rev. 25 (1965) (tempering some of the earlier criticisms).

10. *See e. g.*, Greenbaum, *supra*, note 8, at 1; Moore & Currier, *supra*, note 8, at 301; Overton, *The Restatement of Judgments, Collateral Estoppel, and the Conflict of Laws*, 44 Tenn.L. Rev. 927 (1977); von Moschzisker, *Res Judicata*, 38 Yale L.J. 299 (1929).

11. Semmel, *supra* note 9, at 1464–66; Von Moschzisker, *supra* note 10, at 303, Moore & Currier, *supra* note 8, at 309 ·10.

12. Quaker states in its brief that there are 132 persons who were eligible field service personnel at the time of the sale to Allied, and that Quaker had in its employ field service personnel at the time of the sale who would not reach the age of sixty until the year 2010 A.D.

collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action. 439 U.S. at 329–30, 99 S.Ct. at 650–51.[13] This situation is enhanced when one of the plaintiffs has a particularly strong case or presents particularly sympathetic circumstances justifying relief. By waiting until this plaintiff has litigated, other plaintiffs may hope to "ride on his coat tails" to a judgment against defendant, even though the other plaintiffs' individual cases might not be as strong and might have been treated differently in terms of liability found or relief granted if all the cases had been tried together.[14]

These considerations are quite relevant to the case before us. It is difficult to imagine a more sympathetic plaintiff than Mr. Workman. After all, he was barely six months short of age sixty and inactive status when Quaker abruptly sold its feed division and terminated his employment with them. Moreover, up to that time he had been actively engaged in training his successor at Quaker's request, and had even been paying his successor with funds from his own pocket. Given these facts, the trial judge had less incentive to engage in a rigorous consideration of contract law in his first ground of decision because of the clear evidence of reliance which supported the second ground. Had Workman's claim been considered along with that of a 35 year old plaintiff who had shown no detrimental reliance on the Crutchfield memo, the trial judge might well have considered the contractual questions supporting his first ground of decision with more circumspection. The trial judge himself recognized the existence of a problem when he noted in his memorandum opinion in *Hicks* that his *Workman* opinion "had, perhaps, stated the law too broadly."

Lest we be misunderstood, we hasten to point out that we do not mean to suggest that there was any collusion between the plaintiffs in *Hicks* and Mr. Workman, or that the *Hicks* plaintiffs deliberately waited for the *Workman* litigation to conclude before filing their own lawsuits. There is no evidence in the record which would support such a hypothesis, nor is there any showing that intervention in *Workman* was possible for any or all of them. Nor do we mean to suggest that the trial judge was being deliberately unfair to Quaker in his *Workman* opinion. What we are suggesting is that the problems of applying offensive collateral estoppel based on prior litigation of an especially sympathetic claim are magnified when the prior litigation is based on alternative grounds of decision. Of course, we do not think that the fact that a prior litigation was correctly determined in favor of a plaintiff with a strong case is by itself a sufficient objection to using it as offensive collateral estoppel later on. Rather, we are focusing on the incentives of the trial judge to rigorously consider, and the defendant to vigorously protest, the legal or factual basis of alternative grounds of decision. Our point is that where such incentives are lacking, there is not the same guarantee of a true adversary determination, and so the chance of unfairness is increased if the alternative ground is later used as an offensive estoppel.

■ Our reading of the trial judge's opinion indicates that he considered himself compelled to apply estoppel in this case even though the basis of decision relied upon by plaintiffs might be questionable as a matter of contract law. In so doing we think he neglected to consider the proper factors of fairness just discussed. Although the decision to apply offensive collateral estoppel rests in the discretion of the trial judge, *Parklane, supra,* this discretion is not

---

**13.** *See* Semmel, *supra* note 9, at 1473–74. *But see* Callen and Kadue, *supra* note 9, at 779–786 (arguing that these concerns are exaggerated.)

**14.** *Cf.* Overton, *supra* note 10, at 934–35 and n.26 (juries may be swayed by intangible factors which would not exist in other cases; it is

unfair to bind an unsuccessful defendant who had no choice but to defend the action brought by A in later litigation with B, once it is conceded that the losing party might well have won both cases if the sequence had been reversed.)

unbounded and must be channeled through the considerations of fairness listed in *Parklane*, along with any other considerations of fairness which the trial judge deems appropriate.[15] Because of the factors we have just discussed we think that the use of offensive collateral estoppel in the present litigation was inappropriate and an abuse of discretion by the trial judge.

Our holding today is limited. We need not and do not decide whether the new Restatement rule denying estoppel effect to unappealed alternative grounds of decision should apply to all cases. We merely hold that such a rule is especially appropriate in the case of offensive collateral estoppel, where the problems of assuring a rigorous determination of all grounds of decision are magnified.[16]

Because we have held that it was improper to use offensive collateral estoppel as to the alternative holding that the Crutchfield memorandum subjected Quaker to liability under the terms of a valid bilateral contract, we think that collateral estoppel was also improperly used as to the findings subsidiary to this alternative determination. These were the finding that the benefits under the regular and inactive status programs were not mutually exclusive and the finding of no duty to mitigate damages.

*Contractual Issues*

Since we do not permit the use of collateral estoppel in this case, a discussion of the disposition of the relevant contract issues on the merits becomes necessary. Simply stated, our conclusion is that ambiguities in the contract and an incomplete record caused by the procedural posture of the case when it went to trial require us to remand to the trial court for further proceedings.

The first problem concerns the present status of the summary judgment motion granted to Quaker. The original decision had held that there was no contract as a matter of law because of a lack of mutuality of consideration. The decision also held that there was no possible recovery on a theory of reliance or promissory estoppel, but this holding was changed when Hicks moved for reconsideration. Thus, at the time of trial, the summary judgment motion only held as a matter of law that there was no contract because plaintiffs had offered insufficient consideration.

After trial, the district court held that collateral estoppel prevented defendants from relitigating the issue of whether the Crutchfield letter constituted a binding bilateral contract. Although the court did not explicitly state what the status of the summary judgment was in the light of its later use of collateral estoppel, we must assume that estopping Quaker from denying that there was a binding contract was a *sub silentio* overruling of the prior holding that there was no contract as a matter of law. Even though we have held that collateral estoppel was used improperly in this case, we agree with the trial court's reversal of its earlier summary judgment holding that sufficient consideration was not present, and even if there had been no reversal below, we would be compelled to reverse it now as a matter of law.

■ As we show *infra*, there is an ambiguity in the Crutchfield letter which prevents us from deciding as a matter of law whether the letter presents us with an unconditional bilateral exchange of promises, a bilateral contract with conditions precedent, or a unilateral offer inviting accept-

---

**15.** The *Parklane* court did not consider its list of factors was exhaustive. *Parklane, supra*, at 331, 99 S.Ct. at 651.

**16.** In rejecting the "alternative ground" rule in the special circumstances of this case, we do not believe that we are overruling any settled precedent. Counsel for Hicks has not cited to us, nor has our research been able to discover, any case where an unappealed alternative ground of decision has been used offensively for collateral estoppel purposes. The closest case is *Ezagui v. Dow Chemical Corporation*, 598 F.2d 727 (2d Cir. 1979). In *Ezagui*, however, the Second Circuit explicitly noted that offensive collateral estoppel of an alternate ground was proper since the appellate court in the previous case had affirmed on the ground used for estoppel in addition to other grounds. *Id.* at 733. Thus we think *Ezagui* perfectly consistent with the result reached here.

ance by performance. We note that if at least the first interpretation were found true, the language of the instrument would clearly show the presence of consideration on both sides: Quaker would be promising to pay inactive status benefits in return for a promise by plaintiffs (1) not to compete with Quaker, (2) to take a cut in pay, and (3) to hold themselves open for special service if called upon by Quaker. The fact that these promises would be executory would not rob them of their value as consideration. 1 Williston on Contracts § 103 (3d ed. 1964); Restatement (Second) of Contracts § 75 (1979). Because we cannot say that an unconditional interpretation of the letter was incorrect as a matter of law, it cannot be said as a matter of law that there was no consideration, and so a summary judgment motion to that effect was improper.

We now turn to the question of the ambiguity of the Crutchfield letter. Both Quaker and the plaintiffs argue that, collateral estoppel aside, the language of the Crutchfield memo clearly and unambiguously dictates a recovery for their side as a matter of law. Quaker argues that the Crutchfield memo does not bind Quaker contractually because it is a unilateral offer which can only be accepted by an employee's continued performance, i. e., remaining as a Quaker employee until age sixty. In the alternative Quaker argues that even if there is a mutual exchange of executory promises, the Crutchfield memo contains four conditions precedent whose failure will excuse Quaker from contractual liability. These conditions are (1) that the employee must be sixty years of age, (2) that he must be employed by Quaker, (3) that he must fall into the category of "field service personel" as defined in the Crutchfield memo, and (4) that he must have received compensation from Quaker in the five years previous to his sixtieth birthday, from which sum his inactive status salary is to be computed. Quaker also contends that the Crutchfield memo contains two conditions subsequent whose failure will excuse Quaker from performance: (1) that the employee must hold himself out as available for service in the five year period, and (2) that he must not compete with Quaker. Quaker argues that the fact that the sale to Allied meant that none of these plaintiffs were, at age sixty, field sales personnel employed by Quaker, absolves it from any contractual liability.

Hicks and the other plaintiffs agree that the language of the Crutchfield memorandum is clear and unambiguous. However, they insist that the memorandum is a bilateral exchange of executory promises, and contains no conditions, precedent or subsequent. Hence, they argue, there is a valid, binding, bilateral exchange of promises for employment for a fixed term for each plaintiff. Such term is to run from each plaintiff's sixtieth to sixty-fifth birthdays, regardless of whether the plaintiff was employed by Quaker on his sixtieth birthday. In the alternative, the plaintiffs argue that even if the Crutchfield memo contained conditions precedent, Quaker has made performance of these conditions impossible by its sale to Allied and thus Quaker may not escape liability.

In dealing with the respective contentions of the parties, a threshold question is whether the issues presented can be decided as matters of law and are thus appropriate for appellate review even without a prior determination on the merits by the trial court. It is generally true that the legal effect of an unambiguous contract presents a question of law. *Harris v. Williams*, 43 So.2d 364 (Miss.1950) (existence of agreement is question of fact while obligations imposed by contract are questions of law); 4 Williston on Contracts § 616 (3d ed. 1964); Restatement (Second) of Contracts, § 212, comment d (1979). However, where the terms of a contract are ambiguous, the question of their meaning is one for the trier of fact. *Baylot v. Habeeb*, 245 Miss. 439, 147 So.2d 490 (1962), *suggestion of error overruled in part, sustained in part*, 245 Miss. 448, 149 So.2d 847 (1963); *Freeman v. Continental Gin Co.*, 381 F.2d 459 (5th Cir. 1967) (Mississippi diversity case stating that if writing were ambiguous, summary judgment would be improper, for the intent of the parties would then be a

genuine issue of material fact). The question of whether an ambiguity exists which would require a decision by the trier of fact is a question of law. *Christopher v. Safeway Stores, Inc.*, 644 F.2d 467 (5th Cir. 1981) (applying Texas law); *Freeman v. Continental Gin Co., supra; Hoover, Inc. v. McCullough Industries, Inc.*, 380 F.2d 798 (5th Cir. 1967) (applying Alabama law).

 We must decide then, whether an ambiguity is present which would necessitate a determination by a trier of fact. But "[c]ontracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction." *Freeman, supra*, at 465 (quoting *Whiting v. Chicago Stoker Corp.*, 171 F.2d 248, 250–52 (7th Cir. 1948), *cert. denied*, 337 U.S. 915, 69 S.Ct. 1155, 93 L.Ed. 1725 (1949)). If the meaning of the terms is clear and unambiguous, the question is one of law, despite the differing contentions of the parties. However, after examining the Crutchfield letter we are convinced that there is a definite ambiguity as to the meaning of the term "eligible employee," and that this term must be clarified before the legal effect of the document can be ascertained. The Crutchfield letter states:

> The new program will not be fully effective for the next two years, or until July 1, 1968. During this period, *eligible employees who wish to participate* in the new program may elect to do so whenever they wish. *Others who have attained age 60* (but less than age 65) *may continue in actual employment* provided they are needed and are able to perform their normal tasks. On and after July 1, 1968, it is expected that the new program *will be applied to all eligible employees."*

(emphasis supplied)

Quaker argues that "others" here refers to "other eligible employees." Since all the "others" have attained sixty and are presently employed by Quaker (else they could not *continue* in actual employment), Quaker contends that "eligible employees" includes only those employed by Quaker on their sixtieth birthday. Hence, because only "eligible employees" can receive inactive status benefits, the qualifications of being an "eligible employee" create a condition precedent.[17] Quaker bolsters this argument by the following language describing the benefits received by persons on the inactive status plan:

> During the five-year period between age sixty (60) and age 65, they will receive annually in twelve equal monthly installments, one-half of their average *total* compensation for the previous five full calendar years. Total compensation will include bonus and commission, if any, in addition to regular salary.

(emphasis in original)

. . . .

> At the age of 65 years, they will retire under the Quaker Retirement Plan with a total retirement income equal to the amount they would have received *had they remained in active employment* based on the *total income received in the last calendar year before their early retirement.*

(emphasis supplied)

Quaker argues that this language clearly implies that the participant be actively employed and receiving compensation from Quaker in the year before he turns sixty.

The *Hicks* plaintiffs (along with the trial court in *Workman*) thought that "eligible employees" referred only to certain categories of Feed Division employees. They point to the following language:

> Therefore, July 1, 1966, we are making effective a new early retirement program for field sales personnel only. It will include field salesmen, field specialists, regional administrators, and regional and district managers. Important features of the new program, as it applies to eligible Feed Division employees, are outlined below.
>
> They [eligible employees] will be placed on an 'inactive status' on the first day of the month following their *60th* birthday.

---

**17.** Alternatively, under Quaker's theory that the Crutchfield letter was a unilateral promise, the qualifications state the manner in which the offer is to be accepted by performance.

The argument here is that since not all Feed Division employees were mentioned in the above list of positions, "eligible" refers to only those employees falling within the listed categories. Thus, being an "eligible employee" for inactive status benefits is not dependent upon being sixty years old and employed by Quaker. Otherwise, it would be redundant to state that the eligible employees are placed on inactive status when they turn sixty, since they would already be sixty by definition.

We think it clear that extrinsic evidence was necessary to determine the meaning of the words "eligible employee" as understood by the parties. Had we been presented with a complete evidentiary record on the issue of the meaning of the letter, we would have applied the general rule that where extrinsic evidence has been introduced in aid of interpretation, the question of the letter's meaning should be left to the trier of fact except where, after taking the evidence into account, the meaning is so clear that reasonable persons could reach only one conclusion. 4 Williston on Contracts § 616 (3d ed. 1974); Restatement (Second) of Contracts § 212, comment e (1979). We would then rule on the question of the meaning of the letter as a matter of law if reasonable persons could not differ as to what the meaning was, based on the record and the language of the letter itself.

However, this case comes to us in a unique procedural posture. When this case went to trial, the parties were prevented from introducing all available extrinsic evidence as to the meaning of the terms of the letter. This is because at the time of trial, the district judge had granted summary judgment on the issue of contractual liability, and had limited the issues at trial to those based on a theory of detrimental reliance or promissory estoppel. Thus, whatever evidence was offered as to the parties' intent was only admissible if it went to the question of the plaintiffs' reliance on the Crutchfield letter. The court did not change its mind and hold that the defendants were estopped from denying the existence of a binding contract until after all the evidence had been presented. The proper procedure therefore is to send the case back to the trial court to determine the meaning of the ambiguities in its role as trier of fact, and then to construe the legal effect of the document. In so doing, the trial court may wish to take additional evidence to aid in its determinations. The trial court may then make findings as to the proper outcome of this case on the issues of contractual liability, as well as detrimental reliance, an issue which it did not reach before.

Finally, the parties have raised the issues of whether the inactive status program and the regular Quaker retirement program provided mutually exclusive benefits, and what duty, if any, the plaintiffs had to mitigate damages. However, we do not reach these questions, since we hold that factual ambiguities must be resolved in the Crutchfield letter before its legal effect can be determined.

The judgment of the district court is vacated and the case remanded for further proceedings consistent with the above.

VACATED and REMANDED.