**Warner R. WADDELL and Jeanette I. Waddell, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 87–7045.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 1987.

Decided Feb. 26, 1988.

Henry W. Walther and John D. Humbert, Deering, Walther & Sands, Santa Monica, Cal., Russell Iungerich, Los Angeles, Cal., for petitioners-appellants.

Bruce R. Ellisen, U.S. Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellee.

Before TANG, WIGGINS and KOZINSKI, Circuit Judges.

PER CURIAM:

Warner and Jeanette Waddell appeal from the United States Tax Court's redetermination of an income tax deficiency. We consider whether the tax court properly characterized various aspects of the Waddells' investment in computerized electrocardiogram (ECG) terminals.

### Facts

In 1980, the Waddells went into the business of leasing ECG terminals and providing related services to health care providers. To that end, they purchased from Comp–U–Med, Inc. and its wholly owned subsidiary, Comp–U–Med Systems, four System 107 Computer ECG Terminals for the stated price of $27,500 each. They made a $2,500 downpayment on each terminal and executed a seven-year recourse promissory note for the balance of $25,000 per terminal. In addition, they entered into a franchise agreement for the terminals. The Waddells received the right to have ECGs analyzed by Comp–U–Med's computers, Comp–U–Med billing services and training programs, a service contract for the terminals, the right to use Comp–U–Med's name and methods, and other consideration. In return, the Waddells agreed to pay a franchise fee of $500 per terminal and a royalty of $3,000 in the first year and fifty cents per ECG processed by Comp–U–Med's computers thereafter. *See generally Waddell v. Commissioner*, 86 T.C. 848, 854–58 (1986) (Parker, J.).

Under the note, the Waddells were obligated to pay Comp–U–Med an annual mini-

mum of $1,500 per terminal during the seven-year term, which was denominated as interest on the full principal of $100,000 at a per annum rate of six percent. Moreover, the franchise agreement required them to pay Comp–U–Med 50 percent of any gross receipts generated by the terminals, minus certain expenses, to be credited against the principal on the note. If the Waddells did not default on the note payments, they could elect at the end of the initial seven-year term to extend the note and franchise for a second seven-year term on payment of $200 per franchise. During the second term, the Waddells could convert the note to nonrecourse for an additional $1,000 per terminal if the minimum payments were current. If the note were converted to nonrecourse, the Waddells would pay Comp–U–Med all net receipts against outstanding accrued interest and 75 percent rather than 50 percent of any additional net receipts against principal, but they would no longer have to make the $1,500 annual minimum payment. *See generally* 86 T.C. at 854–55.

The terminals purchased by the Waddells were placed with health care providers, but did not generate enough income to earn a profit or begin retirement of the note. The Commissioner of Internal Revenue denied the Waddells favorable tax treatment of the investments, and determined an income tax deficiency of $4,833 for the 1980 tax year.

The Waddells then petitioned for redetermination of the deficiency. The tax court found that the Waddells engaged in the venture with the intent of making a profit, 86 T.C. at 888, 890–94, but ruled against them in characterizing the debts and payments. It determined a deficiency of $806, and the Waddells appealed.

### Discussion

■ A. The Waddells argue that the tax court erroneously characterized various aspects of the ECG terminal purchase and franchise. They contend that the entire principal of the note constitutes true debt for purposes of calculating depreciation and the investment tax credit, and that the $1,500 annual minimum payment is therefore fully deductible as interest. Moreover, they argue that the $3,000 royalty payment is also fully deductible as a business expense.

The tax court issued a lengthy and well-reasoned opinion in this test case, the resolution of which will potentially affect not merely the Waddells but also about two thousand other taxpayers who invested in Comp–U–Med terminals. 86 T.C. at 888. The tax court determined that the fair market value of the terminals was $6,500, substantially lower than the purchase price of $27,500. *Id.* at 888. Because the terminals were not adequate security for the note and the projected revenues from the franchise operation were insufficient to meet the obligation, the tax court found that the note was unlikely to be paid off and therefore was too contingent to qualify as true debt includable in basis. *Id.* at 907. Consequently, it held that the only true indebtedness comprised the minimum annual payment, the renewal fee and the nonrecourse conversion payment, *id.* at 910, and denied a deduction for the $1,500 annual minimum payment as interest on the note. *Id.* The court included the true debt exceeding the value of the terminals in the Waddells' basis in the franchise. *Id.* at 912. It also held that the $3,000 "royalty" was a nondeductible capital expenditure associated with acquiring the franchise. *Id.* at 895–96.

We have carefully reviewed the record and considered the arguments of the parties, and find ourselves in full agreement with the tax court as to those issues. Moreover, it would be difficult for us to improve on Judge Parker's excellent analysis. We therefore adopt her opinion as our own and affirm the judgment of the tax court for the reasons stated therein.[1]

---

1. The tax court also held that the Waddells could not deduct their losses because their invested capital was not "at risk" under I.R.C. § 465(b)(3)(A), (4) (1982). *See* 86 T.C. at 913–15

(Comp–U–Med had interest "other than … as a creditor," and nonrecourse conversion feature constituted "stop loss … or other similar arrangement[ ]"). Section 465, however, operates

**■ B.** The Waddells also argue that the tax court erred in a key evidentiary ruling. To prove the fair market value of the terminals, the Waddells sought to introduce an appraisal prepared for Comp–U–Med by Lawson Ott, a professional appraiser. Ott died six months before trial, however, and the tax court refused to admit his report under the business records exception to the hearsay rule. 86 T.C. at 878; *see* Fed.R.Evid. 803(6). We review for abuse of discretion a trial court's decision to admit or exclude hearsay evidence. *See United States v. Cowley,* 720 F.2d 1037, 1040 & n. 1 (9th Cir.1983), *cert. denied sub nom. St. Clair v. United States,* 465 U.S. 1029, 104 S.Ct. 1290, 79 L.Ed.2d 692 (1984).

In order to constitute an admissible business record, the report must be "kept in the course of a regularly conducted business activity," and it must be "the regular practice of that business activity" to make that report. Fed.R.Evid. 803(6). Even if a document satisfies these requirements, it may still be excluded if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Id.* We find no indication in the record that Compu–U–Med obtained appraisals of this sort as a "regular practice" of its business. There is thus no foundation for admitting it as Comp–U–Med's business record.

We also find no foundation for admitting Ott's report as the business record of the appraisal firm for which he worked. There is no evidence that Ott's firm had a practice of preparing such appraisals for Comp–U–Med. *See Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1258 (9th Cir.1984) (accounting firm's compliance audit not admissible as business record of firm because it "was not a regularly conducted audit" of defendants). As the tax court observed, if this report were admissible as the appraiser's business record, "any appraisal report prepared by any appraising company in the country would come in without the appraiser having to be there to verify it." Reporter's Transcript at 206; *see Paddack,* 745 F.2d at 1258. In any event, the tax court was well within its discretion in excluding the appraisal on the ground that it lacked the appropriate indicia of trustworthiness. Fed.R.Evid. 803(6); *see Paddack,* 745 F.2d at 1258–59.

The Waddells point to *United States v. Licavoli,* 604 F.2d 613 (9th Cir.1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980), where we upheld the admission of an appraisal report prepared for and relied upon by an insurance company in settling a claim for stolen property, and offered by the government against the thief. There is no suggestion in this case, however, that Comp–U–Med relied on the appraisal in a way that would vouch for its trustworthiness. Moreover, in *Licavoli* we merely upheld the trial court's decision to admit the evidence; this is hardly authority for the proposition that the court was *required* to admit it. This is the type of judgment that must be left to the trial judge to make, with little or no second-guessing on appeal. Absent some showing of extraordinary circumstances that would render the trial court's decision wholly arbitrary and capricious, a decision to exclude or admit evidence must be upheld. No such showing has been made here and the tax court was therefore well within its discretion in declining to admit the appraisal report. *See* 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(6)[06], at 803–203 (1987) ("[t]he trial judge has discretion ... to assess the particular factors present to determine whether a more accurate determination could probably be obtained by admitting or excluding the record"); *cf. Forward Communications Corp. v. United States,* 608 F.2d 485, 510, 221 Ct.Cl. 582 (1979) (excluding appraisal report where preparer was unavailable for cross-examination).

only to limit otherwise allowable deductions to the amount actually at risk. Because we affirm the tax court's determination that the amount at risk exceeded the allowable deductions, section 465 is inapplicable and we do not reach this issue. We therefore express no view on that portion of the tax court's opinion dealing with section 465.

C. The Waddells also challenge the tax court's determination of the fair market value of the Comp–U–Med terminals. A trial court's determination of the fair market value of property is a finding of fact that we review for clear error. *Bryant v. Commissioner*, 790 F.2d 1463, 1465 (9th Cir.1986). "Trial courts have particularly broad discretion with respect to questions of valuation." *Ebben v. Commissioner*, 783 F.2d 906, 909 (9th Cir.1986). The tax court discussed its valuation approach at length, carefully explaining how it arrived at a fair market value of $6,500 per terminal. *See* 86 T.C. at 904–06. It compared the Comp–U–Med terminal to those of other manufacturers competing for the low-volume user market, which consists of individual physicians, clinics and small hospitals, and adjusted for the superior features of the Comp–U–Med product. Moreover, the tax court explained its reasons for rejecting the Waddells' valuation based on comparisons with technologically more similar products, noting that Comp–U–Med did not have the reputation or market position to charge the same premiums as Hewlett–Packard and IBM, who sold to large hospitals and other high-volume users. The tax court's methodology was entirely plausible, and its valuation of the terminals was not clearly erroneous.

## Conclusion

The judgment of the tax court is AFFIRMED.