CHARLES E. WAKEFIELD AND MARTHA J. WAKEFIELD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wakefield v. Commissioner
Docket No. 6499-90
United States Tax Court
T.C. Memo 1995-318; 1995 Tax Ct. Memo LEXIS 319; 70 T.C.M. (CCH) 79; July 19, 1995, Filed *319 Decision will be entered for respondent. Charles E. Wakefield and Martha J. Wakefield, pro sese. For respondent: Richard T. Cummings. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year Deficiency 1982
$ 3,036
1985
1,933
1986
3,787
1987
4,781
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are whether petitioners are entitled to deductions under section 167 for the amortization of contracts allowing petitioners the right to use customer lists and, if so, the amounts petitioners are entitled to deduct. FINDINGS OF FACT Some of the facts and certain exhibits have been stipulated for trial pursuant to Rule 91. The parties' stipulations are incorporated in this Memorandum Opinion by reference. Petitioners are husband and wife and were residents of Houston, Texas, when they filed their petition. Petitioners carried back to taxable year 1982 a net operating loss arising *320 out of the amortization deductions in issue taken on petitioners' Federal income tax return for taxable year 1985. Petitioners were distributors of office products for Safeguard Business Systems, Inc. (Safeguard), a manufacturer of record-keeping systems for small businesses, such as pegboard accounting systems, timekeeping systems, billing systems, and similar office products. Petitioner Charles E. Wakefield (petitioner) became a distributor for Safeguard during 1984. Prior to becoming a Safeguard distributor, petitioner worked in the newspaper business for approximately 20 years. Prior to working as a Safeguard distributor with petitioner, petitioner Martha J. Wakefield (Mrs. Wakefield) held clerical and administrative positions in several offices including an accounting office and a medical office. While Mrs. Wakefield was working as an office manager in the medical office, she became acquainted with Coni Mach, a Safeguard distributor who supplied the medical office with Safeguard products. During 1982, Coni Mach informed Mrs. Wakefield of an employment opportunity with Safeguard. Soon after, Mrs. Wakefield was hired by Safeguard to assist customers who were having problems with *321 computerized business systems sold by Safeguard. During 1984, Mrs. Wakefield began to assist petitioner with the distributorship. During September 1986, petitioner became disillusioned with being a distributor because it was not as lucrative as he had expected. Petitioner obtained permission from Safeguard to work elsewhere, and Mrs. Wakefield continued running the distributorship in petitioner's name. Mrs. Wakefield continued as a distributor until on or about August 31, 1990. Initially, petitioner became a Safeguard distributor by entering into an "Interim Regional Distributor Agreement" with Safeguard dated February 21, 1984. Mrs. Wakefield was not a party to that agreement. Mrs. Wakefield ultimately signed a similar agreement with Safeguard dated September 1, 1986. Hereinafter, the agreements collectively are referred to as the distributorship agreements. The distributorship agreements governed the terms and conditions of petitioners' distributorship activities. The distributorship agreements provided for initial terms of 5 years, subject to certain early termination provisions. The distributorship agreements could be terminated by petitioners on 60 days' written notice. Safeguard *322 had the right to terminate the distributorship agreements on 60 days' notice if petitioners failed to earn specified minimum commissions, sold noncompetitive (sic) products without Safeguard's written consent, or failed to perform any other material term of the contract, including the failure to adopt a fictitious trade name. Petitioners did not earn the contractual minimum of commissions during any of the years in issue. Petitioners sold "noncompetitive" products without Safeguard's consent, and petitioners did not register their business under a fictitious trade name. Petitioners also agreed to purchase from previous Safeguard distributors certain rights to solicit orders from customer lists (collectively referred to herein as the contracts and individually as the contract). Consequently, petitioners were entitled to use the acquired customer lists for as long as petitioners remained Safeguard distributors. Although petitioners believed that they owned the customer lists, Safeguard retained ownership of the lists. Petitioners acquired a total of three customer lists. Originally, all three customer lists were part of a sales territory built by Coni Mach & Associates (Mach). Petitioner *323 acquired the first customer list from Mach on January 1, 1984, at a stated contract price of $ 146,787. [1] *324 Mrs. Wakefield acquired the second customer list from Mardan Co. (Mardan) on September 1, 1986, at a stated contract price of $ 21,840. Mrs. Wakefield acquired the third customer list from Donna Jones (Jones) on July 31, 1987, at a stated contract price of $ 111,578. The purchase prices of the customer lists were predetermined. Petitioners neither negotiated nor discussed the purchase prices of the customer lists with the sellers. Petitioners neither read any of the contracts nor consulted legal counsel concerning the contracts. The contract with Mach states that the seller wishes to sell "certain rights * * * to solicit, and receive commissions on, sales of Systems in respect to customers listed on Attachments 1 and 2 hereto" and "Seller hereby assigns to Buyer all Rights with respect to the customers listed on Attachments 1 and 2". The contracts for the purchases of the second and third customer lists were similar to the contract with Mach. [2]
Petitioners, the sellers, and Safeguard agreed in the contracts that 30 percent of petitioners' commissions (less returns and allowances) on the sale of Safeguard products would be held by Safeguard each month to be applied against the purchase prices of the customer lists. The amounts paid to the sellers toward the purchase prices were based on total commissions earned by petitioners, including commissions on sales to accounts obtained by petitioners through their own efforts as well as to accounts on the customer lists purchased from prior distributors. After they ceased to serve as Safeguard distributors, petitioners were no longer liable on their remaining obligations under the contracts for the purchase of the customer lists. [3]
*325 Petitioners amortized the purchase price of each customer list over 5 years. Before claiming the amortization deductions on their returns, petitioners consulted with their accountant, Stan Smith. The following chart illustrates the total commissions earned by petitioners, the amounts applied toward the purchase prices of the customer lists, and the amounts deducted on petitioners' tax returns as amortization or depreciation of such rights: Commissions
Applied to Amount
Year earned purchase price
deducted
1985
$ 31,281.16
$ 9,017
$ 29,357
1986
32,890.22
10,844
30,813
1987
41,453.54
12,546
43,023
Total
105,624.92
32,407
103,193
On or about August 31, 1990, petitioners ceased working as distributors for Safeguard. As of that date, petitioners had earned a total of $ 262,886 in commissions, of which $ 105,429 had been applied toward the purchase prices of the customer lists, leaving an unpaid balance on the contracts of $ 174,776. Beginning with their 1990 tax return, petitioners no longer claimed amortization deductions for the customer lists. Petitioners did not receive any demands for payment of the unpaid portions of the purchase prices, nor were *326 they sued on account of such balances by Safeguard or the previous distributors. Petitioners filed three voluntary bankruptcy petitions, one in 1990 and two in 1992. Petitioners listed "Connie Mach" as a creditor on all three petitions with an amount owing of $ 184,110.99 for "purchase of distributorship". No claim was filed by Mach or Safeguard in any of petitioners' bankruptcy proceedings with respect to such liability. After petitioners ceased working as distributors for Safeguard, Safeguard reassigned the customer lists to a new distributor. Petitioners did not receive any compensation from Safeguard or the distributor who succeeded them in the ownership of the customer lists. Petitioners' liability for the balance of the purchase prices of the customer lists was assumed by the successor distributor. Additionally, Safeguard had advanced money to petitioners against future commissions. Such advances were not recouped in full from earned commissions. When petitioners terminated their relationship with Safeguard, the unpaid balances on the advances were added to the unpaid balances on the contracts and assumed by the successor distributor. In the notice of deficiency, respondent *327 disallowed the deductions claimed by petitioners for amortization of the customer lists in the amounts of $ 29,357, $ 30,813, and $ 43,023 for taxable years 1985, 1986, and 1987, respectively, on the grounds that the useful lives of the customer lists could not be determined with any degree of certainty, petitioners had not verified that the lists had limited useful lives, and a portion of the lists was attributable to goodwill. Respondent, however, allowed deductions pursuant to sections 1253 and 162 in the amounts of $ 9,017, $ 10,844, and $ 12,546 for taxable years 1985, 1986, and 1987, respectively, for contingent payments actually made to Safeguard. OPINION Generally, section 167(a) permits as a depreciation deduction a reasonable allowance for exhaustion and wear and tear (including a reasonable allowance for obsolescence) of property either used in a trade or business or held for production of income. Sec. 167(a). With respect to the amortization of intangible assets, [4]section 1.167(a)-3, Income Tax Regs., provides in pertinent part: If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a *328 limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.
In Newark Morning Ledger Co. v. United States, 507 U.S.  ,   , 113 S. Ct. 1670, 1683 (1993), the Supreme Court held that intangible assets are amortizable, notwithstanding their relationship to goodwill, [5] if the taxpayer can establish that the intangible asset has: (1) An ascertainable cost basis; and (2) a limited useful life, the duration of which can be ascertained with reasonable *329 accuracy. [6] Petitioners have the burden of proof. Rule 142(a).
Although respondent initially contended that petitioners did not acquire any intangible assets subject to amortization when they purchased the rights to use customer lists from prior Safeguard distributors, respondent concedes on brief that the customer lists are intangible assets subject to amortization allowances under appropriate circumstances. Consequently, we are left with respondent's argument that petitioners have not satisfied the two-prong test of Newark Morning Ledger. The first prong of Newark Morning Ledger requires that petitioners prove an ascertainable cost basis to the customer lists. Petitioners contend that their basis in each customer list for purposes of section 167 *330 is the full purchase price of each list as set forth in the contracts with Mach, Mardan, and Jones, respectively. Petitioners further contend that, although their obligations to pay the sellers were nonrecourse, petitioners had a cost basis in the lists equal to the full amounts of the respective purchase prices of the lists. In reply, respondent contends that the general rule that cost basis includes both recourse and nonrecourse liabilities does not apply in the instant case because petitioners" liabilities were too contingent and indefinite in nature to include them in basis. We agree with respondent. For purposes of depreciation and amortization, a taxpayer's basis in acquired property is the taxpayer's cost, which includes valid liabilities incurred in purchasing the property. Crane v. Commissioner, 331 U.S. 1 (1947); Parker v. Delaney, 186 F.2d 455 (1st Cir. 1950); Waddell v. Commissioner, 86 T.C. 848, 898 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Blackstone Theatre Co. v. Commissioner, 12 T.C. 801, 804 (1949). Recourse liabilities *331 are generally included in basis because of the borrower's fixed, unconditional obligation to pay, with interest, a specific sum of money. Nonrecourse liabilities, however, lack the borrower's personal obligation to pay, and the potential for abuse lurking in the claim of deductions in excess of cash investment has caused the courts to test the validity of liabilities and to exclude from basis those obligations that are not likely to be paid. See and cf. Gibson Prods. Co. v. United States, 637 F.2d 1041, 1047-1048 (5th Cir. 1981); Estate of Franlinn v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Fox v. Commissioner, 80 T.C. 972, 1020-1023 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5-7, 9 (3d Cir. 1984); *332 Brannen v. Commissioner, 78 T.C. 471, 493-499 (1982), affd. 722 F.2d 695 (11th Cir. 1984). "A nonrecourse debt will be recognized for tax purposes only if it appears likely from all the facts and circumstances that the obligation will be paid." Waddell v. Commissioner, supra at 902. " There must be a 'reasonable basis for the prediction that the ability of the borrower to repay will not be wholly or substantially contingent upon the success or failure of the business venture.' " Gibson Prods. Co. v. United States, supra at 1047 (quoting Fielder, "Drilling Funds and Nonrecourse Loans -- Some Tax Questions," 24th Southwestern Legal Foundation Inst. on Oil & Gas Taxation 527, 534 (Matthew Bender & Co. 1973)). In the instant case, petitioners' obligations were nonrecourse and contingent on petitioners' success in earning commissions. Petitioners did not make any payments when they signed the contracts with the former distributors -- they merely agreed that Safeguard would withhold 30 percent of their commissions toward the purchase prices of the lists to be paid to *333 the prior distributors. Subparagraph D of paragraph 9 of the Interim Regional Distributorship Agreement states that "if this agreement is terminated for any reason before we collect the full amount remaining on account of the accounts purchased by you, you shall have no further liability for additional payments." Ultimately, petitioners paid only $ 105,429 in commissions toward the purchase prices, which left $ 174,776 owing on the contracts. Petitioners were able to "walk away" from their remaining obligations on the customer lists. None of the prior distributors brought any actions to collect the outstanding balances on the lists. Moreover, when petitioners filed bankruptcy petitions during 1990 and 1992, none of the distributors filed any claims. The unpaid balances were assumed by a successor distributor. Additionally, petitioners have not offered credible evidence to show that the fair market values of the lists were equal to the stated purchase prices of the lists. In Waddell v. Commissioner, supra at 903, we held that, if the stated purchase price is grossly inflated over the property's fair market value, it is fair to conclude that the debt will *334 never be paid and that it should therefore be disregarded for Federal tax purposes. In that the record does not support a finding that the fair market values of the lists were equal to their stated purchase prices, we are unable to conclude that payment of the obligations was likely. Id. at 904. Based on the record in the instant case, we conclude that petitioners' obligations were too contingent to include them in petitioners' bases for Federal tax purposes. Accordingly, we hold that petitioners' bases in the lists were equal to the payments made toward their purchase prices. [7]
The second prong of Newark Morning Ledger requires that petitioners prove ascertainable useful lives of the customer lists that may be determined with reasonable accuracy. In the notice of deficiency, however, respondent allowed petitioners deductions for contingent payments made to Safeguard under section 1253 *335 and section 162 during the taxable year to the extent of the payments made. [8] Consequently, we do not need to address the second prong of Newark Morning Ledger concerning the ascertainable useful lives of the customer lists. Based on the foregoing, Decision will be entered for respondent. Footnotes
1. Although the contract with Mach is dated Jan. 1, 1984, and the Interim Regional Distributor Agreement with Safeguard is dated Feb. 21, 1984, both documents were signed by petitioner on the same day in Safeguard's Houston, Texas, office, and both were prepared by Safeguard. The $ 146,787 figure was calculated by multiplying Mach's 1983 revenue by a factor of $ 1.75.↩
2. Under the distributorship agreements, Safeguard had the right to veto a contract under certain circumstances.↩
3. The Interim Regional Distributorship Agreement provides in part in subpar. D of par. 9 that if "this Agreement is terminated for any reason before we collect the full amount remaining on account of the accounts purchased by you, you shall have no further liability for additional payments."↩
4. For acquisitions after Aug. 10, 1993, sec. 197 governs the amortization of intangible assets.↩
5. Prior to the enactment of sec. 197, goodwill was nondepreciable. See sec. 1.167(a)-3, Income tax Reg.↩
6. The test was originally set forth in Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240↩ (5th Cir. 1973).
7. These are the amounts respondent allowed in the notice of deficiency. See supra↩ p. 8.
8. On brief, respondent notes that the payments are not deductible under sec. 1253 because the payments were made to prior distributors and not to Safeguard. Respondent concedes only that the payments are deductible under sec. 162.↩