T.C. Memo. 1997-62


UNITED STATES TAX COURT


VENA MARILYN WOFFORD, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3387-95.                    Filed February 4, 1997.


G. Tomas Rhodus, for petitioner.

W. Mark Scott, for respondent.


MEMORANDUM OPINION


GOLDBERG, Special Trial Judge:  The case was heard pursuant

to section 7443A(b)(3) of the Code and Rules 180, 181, and 182.[1]

---

[1]    Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue.  All
Rule references are to the Tax Court Rules of Practice and
Procedure.

Respondent determined deficiencies in, additions to, and a penalty on petitioner's Federal income taxes as follows:

| | | Additions to Tax | | | Penalty |
| | | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6651(a)(1) | 6653(a)(1) | 6654(a) | 6662(a) |
| 1988 | $3,088 | $408 | $160 | --- | N/A |
| 1989 | 5,760 | 1,393 | N/A | --- | $1,152 |
| 1990 | 7,721 | 1,930 | N/A | $10 | --- |
| 1991 | 6,880 | 1,720 | N/A | 397 | --- |

After concessions,[2] the issues for decision are: (1) Whether petitioner is entitled to amortization deductions with respect to certain intangible assets acquired in connection with her business of being a Safeguard distributor; and (2) whether petitioner is allowed to carry forward net operating losses sustained in taxable years 1988, 1989, and 1990.

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits received into evidence are incorporated herein by this reference. Petitioner resided in Dallas, Texas, at the time her petition was filed.

Petitioner began working in the printing business in 1968 in the Dallas-Fort Worth area of Texas. She was employed in the early 1970's as a salesperson and sales manager for a company

[2] Petitioner concedes she is liable for the additions to tax under sec. 6651(a)(1) for each taxable year in issue, and under sec. 6654(a) for the taxable years 1990 and 1991. Respondent concedes the addition to tax under sec. 6653(a)(1) for 1988 and the penalty under sec. 6662(a) for 1989. Petitioner concedes she is liable for self-employment tax on her taxable income as finally redetermined, and agrees to all of the arithmetical adjustments set forth in the notice of deficiency to the amount of taxable income as finally redetermined.

engaged in the business of producing and selling printed checks and accounting-related forms designed for small businesses. At that time, petitioner became familiar with the products of Safeguard Business Systems, Inc. (Safeguard), a competitor of the company for which petitioner worked.

Safeguard is engaged in producing and selling business forms to small business owners. Safeguard's products and sales are oriented toward smaller businesses, those with 50 or fewer employees, with a primary focus on businesses employing 20 or fewer persons. Similar forms, although perhaps not of comparable quality, are available at office supply stores. The Safeguard name receives substantial recognition in the industry.

Safeguard has approximately 900,000 customers serviced by a sales network of approximately 850 people in North America. Safeguard does not operate any retail outlets. Safeguard operates through a limited number of distributors. Therefore, in order to solicit sales of Safeguard products, a distributor generally must buy the right to receive commissions on sales to a base of customers (referred to as a base or a list) within a defined geographical territory from a current or former distributor (referred to as a buy-sell).

In 1986, petitioner was recruited by and accepted employment with Safeguard as a branch sales manager. In this capacity, petitioner gave sales support to distributors operating in parts of Texas, Oklahoma, and Colorado. Petitioner did not have

contact with customers and did not solicit sales of Safeguard products. By the end of 1987, petitioner was aware that a few distributors had given up their distributorships and that their customer bases had not been purchased. Petitioner was interested in becoming a distributor, and she communicated her interest to her supervisor.

Petitioner was laid off from the branch sales manager position effective January 31, 1988. As of February 1, 1988, she began acting as a Safeguard distributor with respect to three existing customer lists in the Dallas area. Petitioner acquired the rights associated with two of these customer lists effective February 1, 1988. Petitioner did not immediately acquire the rights to the third customer list but instead she solicited sales under a temporary "babysitting" agreement. Petitioner was to receive standard commission payments less amounts payable as "territory payback". A territory payback (also referred to as territory repayments) represents amounts due to the former distributor for the right to receive commissions on sales to customers on the former distributor's list. Petitioner acquired the right to the commissions related to the third list effective December 1, 1988.

The Regional Distributor Agreement (the agreement) between Safeguard and petitioner bears an effective date of February 1, 1988, but the terms were not finalized and the agreement was not signed until December 1988. Petitioner had the right to solicit

sales of certain products and services and to receive commissions from Safeguard on all such sales credited to her. Safeguard was responsible for billing customers and received payments directly from customers. Petitioner was authorized to represent Safeguard only within a limited geographic area. The agreement had an initial term of 5 years.

Petitioner had the right to terminate the agreement for any reason upon 60 days' notice. Safeguard had the right to terminate the agreement with 60 days' notice under limited circumstances including, but not limited to, failure by petitioner to meet certain annual commission quotas, or petitioner's material failure to perform any of the other terms or conditions of the agreement. Petitioner's annual quotas were set at actual earnings for the first 2 years and left to be negotiated for the remaining 3 years of petitioner's initial 5-year term.

The agreement provided that for a period of 2 years following its termination, petitioner is prohibited from soliciting, selling, or attempting to sell to any Safeguard customer or persons contacted by petitioner for the purpose of their becoming a Safeguard customer within her assigned territory.

The agreement further provided:

We will withhold each month from payments due you under this Agreement a sum equal to the fixed monthly amounts specified in the "Territory Payback Schedule" which is attached hereto

as a rider.  We will continue to make these monthly withholdings until we have withheld the total sum of $588,019.52.  This amount is for the protected right to earn future commissions on sales of Systems to the customers listed in Attachment B [the customer lists] under this Agreement.  It represents the price that the transferor of such rights has set, * * *.

No Territory Payback Schedule was executed or attached to the agreement.  A proposed payment schedule requiring payment over a 10-year period was sent to petitioner in December 1988, but she rejected it, desiring a longer payback period.  No interest rate was ever stated in connection with petitioner's payment obligation.

If the agreement was terminated for any reason before petitioner had paid the full amount remaining with respect to the customer account rights assigned to her (the customer bases), petitioner had no further liability for additional payments.  However, petitioner's right to future commissions with respect to sales to customers on the lists was subject to reduction depending on the nature of the termination, and any commissions payable were to be reduced by any amounts remaining due as territory repayments.

If the commissions earned by a distributor were not sufficient to cover the territory repayments due in that month, as a matter of practice, Safeguard nevertheless would pay the former distributor the amount of the payments due.  Safeguard considered any such amounts to be an advance to the current distributor and would deduct such amounts in the future.

Phillip J. Rigney (Mr. Rigney) signed the agreement on behalf of Safeguard. According to Mr. Rigney, Safeguard was acting as an agent on behalf of the former distributors in the sale of their rights to their customer bases. For over 10 years, Mr. Rigney's position with Safeguard was that of sales manager, which involved direct responsibility for and support of a group of sales distributors. Mr. Rigney found in his experience that the purchase price of a customer list generally is the product of the sales generated from the customer base over the previous 12 months multiplied by a factor ranging from 1 to 2. Mr. Rigney's recollection was that there were several negative factors associated with the lists as to which petitioner acquired the commission rights, including the poor economy in Texas in 1988 and the lack of consistent servicing of the customers on the lists. A factor of 1 was used in determining the price charged to petitioner. In Mr. Rigney's opinion, petitioner was a strong negotiator, and he believed that this is why the Agreement was not finalized until December 1988.

Petitioner received commission statements on or about the fifteenth of each month for the prior month's sales. Petitioner operated her business on the cash basis. Safeguard withheld territory repayments of $18,238.42 in 1988 from petitioner's monthly commission statement. The amounts withheld in 1988 were not fixed monthly sums but varied. Petitioner's monthly commission statements for 1989 reflect a total amount of

$16,424.58 withheld as territory repayments in the following
amounts:

| Month | Base 5H5 | Base 513 | Base 5W1 |
|-------|----------|----------|----------|
| December 1988 | $1,074.58 | -- | -0- |
| January 1989 | 1,950.00 | -- | -0- |
| February 1989 | 2,200.00 | -- | -0- |
| March 1989 | 0.00 | -- | -- |
| April 1989 | 0.00 | -- | -- |
| May 1989 | 1,400.00* | -- | -0- |
| June 1989 | 1,400.00* | -- | -0- |
| July 1989 | 1,400.00* | -0- | -- |
| August 1989 | 1,400.00* | -0- | -0- |
| September 1989 | -- | $1,500.00 | -- |
| October 1989 | -- | 1,500.00 | -- |
| November 1989 | -- | 1,200.00 | -- |
| Totals | $10,824.58 | $4,200.00 | -0- |

* Created a deficit commission balance that was carried
forward into subsequent month(s).

Petitioner received commission payments from the aggregate due on
the bases; therefore, a deficit commission balance for one base
was offset against net commissions payable from the other bases.
Territory repayments of $16,800 and $19,000 were withheld from
petitioner's monthly commission statements in 1990 and 1991,
respectively.  Petitioner presently has approximately $36,000 a
year withheld from her commissions as territory repayments.  At
this rate, she is scheduled to complete the territory repayments
approximately 17 years from 1988.

Mr. Rigney estimated that generally the turnover rate of a
customer base, that is the number of years after which no repeat
business is generated from a base, ranged from 5 to 11 years
after a buy-sell is completed.  From her experience as a branch

sales manager, petitioner believed the typical turnover rate to be 5 to 10 years. Petitioner determined the useful life of the customer lists she had acquired in 1988 by determining how many customers contained thereon remained active as of the end of 1992. She found that 85 to 95 percent of the customers were no longer purchasing from her at that time, and, from this, she estimated the useful life of the bases to be 7 years.

Petitioner acted as a Safeguard distributor from February 1, 1988, and throughout the years in issue, carrying on this business under the name of Prestonwood Business Forms. Other than the salary which petitioner received from Safeguard for the month of January 1988, petitioner's only other source of gross income was derived from rental real estate property that she operated at a loss during the taxable years in issue. At the time of trial, petitioner continued to be engaged in business as a Safeguard distributor.

Petitioner claimed deductions for amortization related to the customer lists based on a cost basis of $588,020 and a useful life of 7 years. Petitioner filed her income tax returns for the taxable years 1988, 1989, 1990, and 1991 in 1993. On Schedule C, Profit or Loss from Business or Profession, of her Federal income tax return filed for the taxable year 1988, petitioner claimed amortization deductions in the amount of $77,003. Petitioner claimed amortization deductions in the amount of $84,003 on Schedule C of her return filed for 1989. Petitioner seeks

additional amortization deductions for 1990 and 1991 in the amount of $84,003 each. Petitioner also claims a net operating loss carryover of $98,050 from prior years in tax year 1990, and an NOL carryover of $142,031 in 1991.

In the notice of deficiency, respondent disallowed $63,571 and $68,978 of petitioner's claimed amortization deductions for 1988 and 1989, respectively. Respondent determined that petitioner's liability was not fixed for the "Territory Payback Agreement", and, therefore, petitioner was not entitled to related amortization deductions. Respondent prepared substitute returns for petitioner for the taxable years 1990 and 1991. Respondent allowed petitioner Schedule C expenses of $16,800 and $17,400 in lieu of amortization deductions for 1990 and 1991, respectively, because petitioner had failed to establish that her liability was fixed for the territory payback.

Respondent's determinations are presumed to be correct, and petitioner bears the burden of proving that they are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

Under section 167(a) a taxpayer may deduct as depreciation a reasonable allowance for the exhaustion and wear and tear of property used in a trade or business or held for the production of income. An intangible asset may be the subject of an allowance for depreciation (or amortization) if such asset is known from experience or other factors to be of use in business or in the production of income for a limited period of time which

can be estimated with reasonable accuracy.  Sec. 1.167(a)-3, Income Tax Regs.  No deduction for depreciation is allowable with respect to an intangible asset, the useful life of which is not limited.  Id.  Under the regulation, "No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life.  No deduction for depreciation is allowable with respect to good will."  Id.  However, an intangible asset with an ascertainable value and a limited useful life, the duration of which can be ascertained with reasonable accuracy, is depreciable under section 167, notwithstanding the fact that its value is related to the expectancy of continued patronage.  Newark Morning Ledger Co. v. United States, 507 U.S. 546, 570 (1993).

Petitioner contends that she acquired the customer lists and that her basis in those lists was equal to the purchase price set forth in the agreement.  Thus, petitioner argues that her basis includes the total amount due as territory repayments.

Respondent makes two counterarguments.  Respondent argues that petitioner's obligation to make territory repayments was too contingent and cannot be included in computing petitioner's basis in her distributorship.  Thus, respondent contends that petitioner has not established a basis in excess of actual cash payments.  Respondent also argues that petitioner did not actually acquire the customer lists, but instead acquired franchise rights as defined in section 1253.  Respondent contends

that petitioner has not established that her right to the commissions from the customers contained on the lists had an ascertained value separate and distinct from other intangible rights she acquired.

For purposes of depreciation and amortization, a taxpayer's basis in purchased property is the cost, including any valid liabilities incurred in acquiring the property. Crane v. Commissioner, 331 U.S. 1 (1947). Ordinarily, recourse liabilities are included in basis because the taxpayer has a fixed, unconditional obligation to pay, with interest, a specific sum of money. Waddell v. Commissioner, 86 T.C. 848, 898 (1986), affd. 841 F.2d 264 (9th Cir. 1988). A borrower does not incur the same personal obligation to pay under a nonrecourse liability. However, a nonrecourse obligation will be included in a taxpayer's cost basis if it is a true debt. Id. An obligation that is contingent will not be recognized for the purposes of determining cost basis. Id. The principle that an obligation or liability that is contingent will not be recognized for the purposes of determining cost basis predates cases involving tax sheltered investments and applies with equal force in cases not involving tax shelters. See, e.g., Lemery v. Commissioner, 52 T.C. 367, 377-378 (1969), affd. on another issue 451 F.2d 173 (9th Cir. 1971). A debt will be recognized for tax purposes if it appears likely, based on the facts and circumstances at the outset of the transaction--including reasonable revenue

projections based on objective criteria and the value of the security at the time the lender has a right to proceed against the security for payment--that the obligation will be paid. Waddell v. Commissioner, supra at 904.

The territory repayments due under the agreement were payable only out of petitioner's commissions. Petitioner was not otherwise required to make payments if she did not earn sufficient commissions. Thus, the obligation was nonrecourse as to her. The monthly withholdings were not set at any amount at the inception of the transaction, the relevant period in our analysis. Waddell v. Commissioner, supra. It is true that the obligation was set at a fixed amount; however, we do not believe this makes the obligation any less contingent. See Graf v. Commissioner, 80 T.C. 944, 949 n.6 (1983). Petitioner's obligation was still conditioned on her success in earning commissions.

Petitioner argues, nonetheless, that her obligation was "real". Both petitioner and Mr. Rigney testified that they viewed petitioner's obligation as real. Further, petitioner places great weight on the value of the lists, which she argues served as collateral securing her obligation to Safeguard. Petitioner argues that she was building equity in her interest in the lists, and that she had an incentive to fulfill her repayment obligation to avoid foreclosure.

Respondent counters that petitioner and Safeguard failed to follow customary business practices, indicating that the obligation was not a true debt. In this regard, respondent points out that at the time the agreement was entered into neither petitioner nor Safeguard required a final payment date, a written repayment schedule, a minimum repayment amount based on a dollar amount or percentage of income, or a specified interest factor.

We agree with respondent that these factors were clearly present and tend to indicate that the obligation was not bona fide. While we believe the testimony of the witnesses to be credible, the subjective intent of the debtor to repay and the subjective expectation of the lender to be repaid are not controlling. Graf v. Commissioner, supra at 952 (citing Denver & R.G.W. R.R. v. United States, 205 Ct. Cl. 597, 603, 505 F.2d 1266, 1267 (1974)). "It is mere conjecture that a taxpayer will make payments when he is not so obligated." Id.

In addition, it is not clear when Safeguard's right to foreclose on the "collateral" would be triggered. Safeguard's right to terminate the agreement, and thereafter transfer the lists, was not absolute. After termination of the agreement, Safeguard clearly had the right to transfer the lists in a manner consistent with its own best interests. However, there is no evidence in the record from which we can determine what the value might be at any such time. We cannot determine from the record

that the fair market value of the rights acquired by petitioner and claimed by her as a cost basis was equal to $588,019.52, the total amount which was to be withheld from her commissions according to the agreement. Moreover, the withholdings were contingent on her success in earning commissions. She has failed to establish that any amount approximating the $588,019.52 was likely to be paid.

Further, the material facts in this case are virtually identical to the facts present in Wakefield v. Commissioner, T.C. Memo. 1995-318. In that case, the taxpayers as Safeguard distributors claimed deductions for amortization with respect to certain customer lists acquired in connection with their distributorships. The taxpayers did not make any cash payments when they signed their distributorship agreements. Safeguard was to withhold 30 percent of the taxpayers' commissions on the sale of Safeguard products to be applied against the purchase price of customer lists. The taxpayers were not liable for any payments once they ceased to be Safeguard distributors. The Court found that the taxpayers' obligations were nonrecourse and contingent on their success in earning commissions. Id. In addition, the Court found that the taxpayers had not established that the fair market value of the lists was equal to their stated purchase price, nor had they established that payment of the obligations was likely. Id. Therefore, the Court concluded that the

taxpayers could not include the amount of the obligations in computing the cost bases of the lists.

Petitioner's attempt to distinguish Wakefield v. Commissioner, supra, is not persuasive. Petitioner contends that it is significant the payments therein were based on a percentage of sales, whereas her payments were to be a fixed monthly sum. The crucial factor, however, is the same in both cases: an obligation would only arise if commissions were earned.

We find that petitioner's liability under the agreement was contingent, and, therefore, no amount of the obligation may be included in computing her cost basis. Thus, petitioner has not established that the cost basis of her interest in the customer lists exceeded her cash payments. In her notice of deficiency, respondent allowed petitioner deductions for the amount of the cash payments in the taxable years in issue.[3] Therefore, we need not address respondent's argument that petitioner acquired franchise rights.

Based on the disallowance of a portion of petitioner's amortization deductions for tax year 1988 and 1989, and the disallowance of such deductions in 1990 and 1991, respondent determined that petitioner did not sustain net operating losses in any of the years in issue. Thus, as a result of our decision

---

[3] Respondent determined that petitioner made payments of $15,024.58 in 1989. We find that petitioner made payments of $16,424.58.

on the amortization issue, it is not necessary to decide if petitioner is entitled to carry forward the losses she claimed from her Safeguard distributorship.

<u>Decision will be entered under Rule 155</u>.