IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-60148
_____


James L. Hudson,

Plaintiff-Appellant,

versus

Commissioner of Internal Revenue,

Defendant-Appellee.

_____

Appeal from the United States Tax Court
(4272-92)
_____

November 13, 1995

Before KING, DeMOSS, and STEWART, Circuit Judges.

PER CURIAM[*]:

James L. Hudson appeals the United States Tax Court's

affirmance of the Commissioner's determination of deficiencies

for the tax years 1981 through 1985.  Finding no error, we

affirm.


**I. BACKGROUND**

---

[*]     Local Rule 47.5 provides:  "The publication of opinions
that have no precedential value and merely decide particular
cases on the basis of well-settled principles of law imposes
needless expense on the public and burdens on the legal
profession."  Pursuant to that Rule, the court has determined
that this opinion should not be published.

From 1982 to 1985, James L. Hudson ("Hudson"), through his wholly-owned subchapter S corporation named Texas Basic Educational Systems, Inc. ("TBES"), engaged in an investment program in which TBES purchased and then leased master audio tapes. TBES leased the master tapes to investors who were to make cassette copies and market the copies on a retail basis to consumers. In August 1982, Educational Audio Resources, Inc. ("EAR") was formed by Michael Brovsky and Chet Hanson to produce and sell the master tapes to TBES.

During 1982 and 1983, TBES entered into agreements with EAR to purchase 423 master audio tapes for $200,000 each. The $200,000 purchase price for each master tape was represented by a $5,000 cash payment and a $195,000 promissory note bearing interest at an annual rate of ten percent for a ten-year term. Under the terms of the promissory notes, TBES had no obligation to make principal or interest payments during the ten-year term unless it realized profits from the lease of the master tapes. If TBES did realize a profit, payments on the notes were to be made to the extent of 30% of the net profits. At the end of the ten-year term, the balance and accrued interest would become due. TBES has made no payments on the promissory notes.

EAR began producing the master tapes in late 1982 and 1983. EAR's budgeted and actual costs of production for each master tape were approximately $500, including between $100 and $200 for the script writer, the cost of recording, and art work. The tax court found that the quality of the master tapes was poor, that

the scripts were written by unknown authors, poorly written, and too short, and that the recordings were made with the voices of unknown individuals and contained mispronunciations and grammatical errors.

During 1982 and 1983, TBES entered into lease agreements for the master tapes with 423 investors. Each investor agreed to pay $10,000 cash plus 60% of the revenue generated from the sale of cassette copies of the master tape. Hudson represented to the investors that each master tape had a fair market value of $200,000. Hudson also advised the investors that each would be entitled to claim an investment tax credit of $20,000--10% of the fair market value of the leased master tape--regardless whether the investor sold any copies.

In March 1985, the commissioner brought suit in the United States District Court for the Southern District of Texas ("the prior proceeding") under Internal Revenue Code ("IRC") sections 6700 and 7408 to enjoin Hudson's further promotion of the master audio tape investment program, alleging that the program was an abusive tax shelter and that the master tapes were overvalued by more than 200%. On August 16, 1988, after trial, the district court denied the injunction, finding that the master audio tapes leased by Hudson were not overvalued by more than 200%, that each master tape was worth at least $100,000, and that Hudson's actions in promoting the master audio tape investment program were not illegal.

3

The commissioner appealed the district court's judgment to the United States Court of Appeals for the Fifth Circuit. On April 3, 1990, this court affirmed the district court's judgment denying the injunction, but on different grounds ("the Fifth Circuit opinion"). Our entire opinion reads as follows:

> This is an appeal from a denial of an injunction by a United States District Court. The Internal Revenue Service requested that defendants be enjoined from engaging in activities violative of statutes and rules regulating tax shelters. We affirm the denial of injunctive relief but not for the reasons stated by the district court. Rather, we affirm the denial of injunctive relief for the reason that the record is bereft of evidence sufficient to warrant a conclusion that continuing violations were threatened. The transactions complained of by the government have apparently collapsed of their own weight. We emphasize that we do not suggest that the government was incorrect in its contentions that the complained of transactions were not legal.

On December 21, 1988, Hudson filed his untimely 1982 and 1983 individual federal income tax returns on which he claimed substantial losses related to TBES and created by depreciation deductions for the master audio tapes. The commissioner, after an audit, disallowed the losses on the grounds that the master audio tapes purchased by TBES had little or no value and did not support the substantial depreciation deductions taken, that the promissory notes issued as payment for the tapes were not genuine, and that the master tapes were not "placed in service" in 1982 and 1983.

On February 27, 1992, Hudson filed a petition in the tax court challenging the deficiencies assessed by the commissioner ("the tax court proceeding"). After trial on March 5, 1993, the

4

tax court requested that the parties brief the collateral estoppel issue that had been raised by Hudson.  On June 23, 1993, the tax court entered an opinion holding that the commissioner was not collaterally estopped from litigating the fair market value of the master tapes by the district court's finding in the prior proceeding that each tape was worth at least $100,000, because the Fifth Circuit specifically declined to address this fact finding in affirming the denial of the injunction.

On July 27, 1994, the tax court entered an opinion holding that: (1) the promissory notes did not constitute genuine indebtedness; (2) each master tape had a fair market value of $5,000 or less; (3) no master tapes were placed in service in 1982, and 125 master tapes were placed in service in 1983; (4) TBES is thus entitled to depreciation deductions for 125 master tapes beginning in 1983 at a cost basis of $5,000; (5) no depreciation is allowed for the remaining 298 master tapes because they were not produced or placed in service in 1982 and 1983; and (6) because the promissory notes were not genuine, Hudson did not realize any discharge of indebtedness income in 1984 and 1985.  The tax court's decision assessing deficiencies in income tax and additions to tax for the tax years 1981 through 1985 was entered on November 22, 1994.  Hudson filed a timely notice of appeal on February 16, 1995.


## II. STANDARD OF REVIEW


5

We review the decision of a tax court under the same standards that apply to district court decisions. Thus, issues of law are reviewed de novo, and findings of fact are reviewed for clear error. Park v. Commissioner, 25 F.3d 1289, 1291 (5th Cir.), cert. denied, 115 S. Ct. 673 (1994); McKnight v. Commissioner, 7 F.3d 447, 450 (5th Cir. 1993). A finding of fact is clearly erroneous when, although there is enough evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed. Henderson v. Belknap (In re Henderson), 18 F.3d 1305, 1307 (5th Cir.), cert. denied, 115 S. Ct. 573 (1994).

### III. DISCUSSION

On appeal, Hudson presents two arguments. First, he contends that the tax court erred in holding that the commissioner was not collaterally estopped from litigating the fair market value of master audio tapes for which Hudson had claimed depreciation deductions. Second, Hudson argues that the tax court's determination that Hudson was entitled to depreciation deductions with respect to only 125 master audio tapes in 1983, and none in 1982, was clearly erroneous. We will address each claim of error in turn.

### A. Collateral Estoppel

Hudson argues that the doctrine of collateral estoppel should have been applied by the tax court to preclude the

6

commissioner from relitigating the fair market value of the master tapes in the tax court proceeding because the district court in the prior proceeding conclusively found that each master tape had a fair market value of at least $100,000.  The government argues that the tax court correctly determined that the district court's findings of fact in the prior proceeding do not have preclusive effect.

The doctrine of collateral estoppel prevents relitigation between the same parties of issues of fact or law that were decided in an earlier proceeding on a different cause of action. Montana v. United States, 440 U.S. 147, 154-55 (1979).  The purposes of collateral estoppel are to protect parties from the burden of relitigating an issue that has been already decided and to prevent inefficient use of judicial resources.  Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979).

For collateral estoppel to apply, a court must decide whether "(i) the issue at stake is identical to the one involved in the prior litigation, (ii) the determination of the issue in the prior litigation was a critical, necessary part of the judgment in that earlier action, and (iii) special circumstances exist which would render preclusion inappropriate or unfair." McDuffie v. Estelle, 935 F.2d 682, 685 (5th Cir. 1991); Hicks v. Quaker Oats Co., 662 F.2d 1158, 1166 (5th Cir. Unit A, 1981). Although an issue has been fully litigated, the prior judgment will not act as collateral estoppel if the issue was not

necessary to the rendering of the prior judgment. <u>Hicks</u>, 662 F.2d at 1168.

When a trial court's judgment is vacated, reversed, or set aside by an appellate court, collateral estoppel will not preclude relitigation of the trial court's conclusions of law or findings of fact. <u>Id.</u> Similarly, where a trial court's findings are challenged on appeal, "once the appellate court has affirmed on one ground and passed over another, preclusion does not attach to the ground omitted from its decision." <u>Dow Chemical v. EPA</u>, 832 F.2d 319, 323 (5th Cir. 1987) (quoting C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4421 (1981)); <u>Hicks</u>, 662 F.2d at 1168 ("the general rule is that if a judgment is appealed, collateral estoppel only works as to those issues specifically passed upon by the appellate court"); <u>see also</u>, <u>Borst v. Chevron Corp.</u>, 36 F.3d 1308, 1314 n.11 (5th Cir.) (noting that because the court did not consider an issue, "the district court's ruling on that issue is not conclusive between the parties"), <u>cert. denied</u>, 115 S. Ct. 1699 (1994).

In the prior proceeding, the district court denied the United States's request for an injunction on the grounds that Hudson had done nothing illegal, finding, inter alia, that the fair market value of the master audio tapes was at least $100,000 each. The Commissioner challenged those findings on appeal. The Fifth Circuit affirmed the district court's denial of the injunction, but did so on the grounds that no evidence was presented that continuing violations were threatened. The court

of appeals emphasized that "we do not suggest that the government was incorrect in its contentions that the complained of transactions were not legal."  Because the Fifth Circuit in the prior proceeding did not address the district court's fact finding on the fair market value of the master tapes, that finding could not preclude the Commissioner from contesting the fair market value of the master tapes in the tax court proceeding.  See Dow Chemical, 832 F.2d at 323.  Therefore, the tax court did not err in determining that collateral estoppel does not bar the Commissioner from arguing that the master audio tapes had a fair market value of less than $100,000.

**B.    How many Master Tapes were Placed in Service?**

Hudson contends that the tax court's determination that only 125 master tapes, rather than 423, were placed in service in 1983, and none in 1982, was clearly erroneous.  The government responds that the tax court's finding that no more than 125 master tapes had been placed in service in 1983 is amply supported by the record and is not clearly erroneous.  Before we address Hudson's argument, we will first summarize the relevant factual findings.

In its final opinion, the tax court found that "during 1982 and 1983, TBES entered into 423 lease agreements with individual investors with respect to master tapes that were purportedly produced and completed."  However, the tax court additionally found that "the record does not support a conclusion that the

9

same number of actual master tapes had been produced and existed during 1982 and 1983." The tax court stated that "by the end of 1983, only 125 tapes had been produced," and that "in 1982 and 1983 EAR sold to TBES only 125 master tapes." Finally, the tax court found that because only 125 tapes had been produced by the end of 1983, only 125 tapes had been placed in service for the 1983 tax year. Therefore, the tax court concluded that Hudson could only claim depreciation deductions with respect to those 125 tapes for tax year 1983. The tax court also concluded that Hudson could take no depreciation deductions for master tapes in 1982.

Hudson argues that the tax court should be estopped from finding that only 125 master tapes were placed in service in 1983 because the Commissioner had conceded in the prior proceeding and earlier in the tax court proceeding that 423 tapes were purchased and leased during 1982 and 1983. Hudson contends that because 423 master tapes were leased by the end of 1983, 423 tapes were placed in service for purposes of depreciation deductions.

The Commissioner concedes that 423 tapes were purchased by TBES during 1982 and 1983. The Commissioner argues that, although TBES entered into 423 lease agreements with investors by the end of 1983, and even if it purchased 423 master tapes from EAR, Hudson failed to demonstrate that more than 125 tapes had been produced and actually existed by the end of 1983, or that any tapes actually existed in 1982.

10

The taxpayer bears the burden of proving his entitlement to a deduction. <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Depreciation deductions are allowed in the year in which qualifying property is placed in service by the taxpayer. 26 C.F.R. § 1.167(a)-10(b); <u>Noonan v. Commissioner</u>, 52 T.C.M. (CCH) 534, 544 (1986), <u>aff'd</u>, 976 F.2d 737 (9th Cir. 1992). Property is placed in service when it is first placed "in a condition or state of readiness and availability for a specifically assigned function." 26 C.F.R. § 1.167(a)-11(e)(1)(i); <u>Noonan</u>, 52 T.C.M. (CCH) at 544. Property held for lease is placed in service when it is ready and available for lease and is first held out for lease. <u>Waddell v. Commissioner</u>, 86 T.C. 848, 898 (1986), <u>aff'd</u>, 841 F.2d 264 (9th Cir. 1988).

Hudson argues that because 423 leasing agreements were entered into in 1982 and 1983, 423 master tapes were held out for lease, thus placed in service, in 1982 and 1983. However, Hudson's argument "exalt[s] form over substance." <u>Noonan</u>, 52 T.C.M. (CCH) at 544. Although the leasing agreements existed in 1982 and 1983, and although TBES may have entered purchasing agreements with EAR for 423 master tapes in 1982 and 1983, the tax court found that the evidence demonstrated that only 125 master tapes actually existed by the end of 1983. Hudson cannot take depreciation deductions for master tapes that were not yet produced in the relevant tax year. Property that does not exist cannot depreciate. <u>See Donahue v. Commissioner</u>, 61 T.C.M. (CCH) 2460, 2469 (holding that a transaction lacked economic substance

11

because the taxpayer failed to produce evidence that the subject matter of the transaction, a master recording, actually existed at the end of the tax year), aff'd, 959 F.2d 234 (6th Cir. 1992).

Finally, we conclude that the tax court's finding that only 125 master tapes were produced, thus placed in service, by the end of 1983, is not clearly erroneous. The evidence demonstrates that as of July 29, 1983, EAR had produced and sold a total of 125 master audio tapes to TBES. Chet Hanson, one of the owners of EAR, testified that EAR ceased producing tapes in 1983. Ms. Raun, an employee of TBES and EAR, testified that many scripts were unfinished at the end of 1983 and that she was still writing scripts at the end of 1984. Ms. Raun testified further that she did not even begin the art work for many tapes until 1984. One investor testified that the tapes he leased during 1983 were not finished until 1984. Testimony of an employee of Hallmark showed that Hallmark's catalog, which was prepared during the period of late 1983 through early 1984, included many tapes that had not yet been produced.

There was also evidence that many of the tapes that were "produced" and existed at the end of 1983 were nevertheless not ready and available to be leased at that time. An employee of Hallmark testified that Hudson considered a tape to have been produced even if only "a sentence was read onto a reel to reel tape," and considered "writing a real script and putting together a real . . . total production" to be "post-production" work.

12

This evidence supports the conclusion that by the end of 1983, only 125 master tapes were placed in service.  Thus, we affirm the tax court's disallowance of Hudson's depreciation deductions for the remaining 298 master tapes in 1983, and for all 423 master tapes in 1982.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the tax court.

13